**CHICAGO PROFESSIONAL SPORTS LIMITED PARTNERSHIP and WGN Continental Broadcasting Company, Plaintiffs–Appellees, Cross–Appellants,**

v.

**NATIONAL BASKETBALL ASSO-CIATION, Defendant–Appellant, Cross–Appellee.**

**Nos. 95–1341, 95–1376, 95–3935 and 95–4021.**

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1996.

Decided Sept. 10, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 7, 1996.*

* Judge Cummings did not participate in the consideration of the suggestion for rehearing en banc.

James E. Hanlon, Jr., Joel G. Chefitz (argued), Stephen D. Libowsky, Laura Keidan Martin, Ronald S. Betman, Robert K. Niewijk, Katten, Muchin & Zavis, Chicago, IL, for Chicago Professional Sports Ltd. Partnership, in Nos. 95–1341, 95-1376.

James E. Hanlon, Jr., Joel G. Chefitz (argued), Stephen D. Libowsky, Laura Keidan Martin, Ronald S. Betman, Robert K. Niewijk, Wendy Fleishman, Katten, Muchin & Zavis, Chicago, IL, for Chicago Professional Sports Ltd. Partnership, in No. 95-3935.

James E. Hanlon, Jr., Katten, Muchin & Zavis, John R. McCambridge (argued), Darrell J. Graham, Irving C. Faber, Charles S. Bergen, Christopher B. Wilson, Grippo & Elden, Chicago, IL, Charles J. Sennet, Trib-une Co., Chicago, IL, for WGN Continental Broadcasting, Inc., in No. 95-1341.

John R. McCambridge (argued), Darrell J. Graham, Irving C. Faber, Michael P. Conway, Charles S. Bergen, Christopher B. Wilson, Grippo & Elden, Chicago, IL, Charles J. Sennet, Tribune Co., Chicago, IL, for WGN Continental Broadcasting, Inc., in No. 95-1376.

James E. Hanlon, Jr., Katten, Muchin & Zavis, John R. McCambridge (argued), Darrell J. Graham, Michael P. Conway, Charles S. Bergen, Christopher B. Wilson, Grippo & Elden, Chicago, IL, Charles J. Sennet, Trib-une Co., Chicago, IL, for WGN Continental Broadcasting, Inc., in No. 95-3935.

James E. Hanlon, Jr., Katten, Muchin & Zavis, John R. McCambridge (argued), Darrell J. Graham, Irving C. Faber, Michael P. Conway, Charles S. Bergen, Christopher B. Wilson, Grippo & Elden, Chicago, IL, Charles J. Sennet, Tribune Co., Chicago, IL, for WGN Continental Broadcasting, Inc., in No. 95-4021.

Marc J. Goldstein, Michael A. Cardoza, Bradley I. Ruskin, Steven C. Krane, Stephen D. Solomon, Ronald S. Rauchberg, Howard L. Ganz, Francis D. Landrey, Stephen L. Weinstein, Proskauer, Rose, Goetz & Mendelsohn, New York City, Christopher Wolf, Warren L. Dennis, Proskauer, Rose, Goetz & Mendelsohn, Washington, DC, James C. Schroeder, Tyrone C. Fahner, Andrew S. Marovitz, Matthew A. Rooney, Herbert L. Zarov, John E. Muench, Mayer, Brown & Platt, Chicago, IL, Carole E. Handler, Proskauer, Rose, Goetz & Mendelsohn, Los Angeles, CA, Jeffrey A. Mishkin (argued), National Basketball Ass'n, Office of the General Counsel, New York City, for National Basketball Ass'n, in No. 95-1341.

Herbert L. Zarov, Mayer, Brown & Platt, Washington, D, Marc J. Goldstein, Michael A. Cardoza, Bradley I. Ruskin, Steven C. Krane, Stephen D. Solomon, Ronald S. Rauchberg, Howard L. Ganz, Francis D. Landrey, Stephen L. Weinstein, Proskauer, Rose, Goetz & Mendelsohn, New York City, Christopher Wolf, Warren L. Dennis, Proskauer, Rose, Goetz & Mendelsohn, Washington, DC, James C. Schroeder, Tyrone C.

Fahner, Kenneth E. Wile, Andrew S. Marovitz, Matthew A. Rooney, John E. Muench, Mayer, Brown & Platt, Chicago, IL, Carole E. Handler, Proskauer, Rose, Goetz & Mendelsohn, Los Angeles, CA, Jeffrey A. Mishkin (argued), Richard W. Buchanan, National Basketball Ass'n, Office of the General Counsel, New York City, for National Basketball Ass'n, in No. 95-1376.

Michael A. Cardoza, Bradley I. Ruskin, Stephen D. Solomon, Ronald S. Rauchberg, Stephen L. Weinstein, Proskauer, Rose, Goetz & Mendelsohn, New York City, Christopher Wolf, Warren L. Dennis, Proskauer, Rose, Goetz & Mendelsohn, Washington, DC, James C. Schroeder, Andrew S. Marovitz, Matthew A. Rooney, Herbert L. Zarov, Mayer, Brown & Platt, Chicago, IL, Carole E. Handler, Proskauer, Rose, Goetz & Mendelsohn, Los Angeles, CA, Jeffrey A. Mishkin (argued), Richard W. Buchanan, National Basketball Ass'n, Office of the General Counsel, New York City, for National Basketball Ass'n, in No. 95-3935.

Marc J. Goldstein, Michael A. Cardoza, Bradley I. Ruskin, Steven C. Krane, Stephen D. Solomon, Ronald S. Rauchberg, Howard L. Ganz, Francis D. Landrey, Stephen L. Weinstein, Proskauer, Rose, Goetz & Mendelsohn, New York City, Christopher Wolf, Warren L. Dennis, Proskauer, Rose, Goetz & Mendelsohn, Washington, DC, James C. Schroeder, Tyrone C. Fahner, Andrew S. Marovitz, Matthew A. Rooney, Herbert L. Zarov, John E. Muench, Mayer, Brown & Platt, Chicago, IL, Carole E. Handler, Proskauer, Rose, Goetz & Mendelsohn, Los Angeles, CA, Jeffrey A. Mishkin (argued), Richard W. Buchanan, National Basketball Ass'n, Office of the General Counsel, New York City, for National Basketball Ass'n, in No. 95-4021.

Before BAUER, CUDAHY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

In the six years since they filed this antitrust suit, the Chicago Bulls have won four National Basketball Association titles and an equal number of legal victories. Suit and titles are connected. The Bulls want to broadcast more of their games over WGN television, a "superstation" carried on cable systems nationwide. The Bulls' popularity makes WGN attractive to these cable systems; the large audience makes WGN attractive to the Bulls. Since 1991 the Bulls and WGN have been authorized by injunction to broadcast 25 or 30 games per year. 754 F.Supp. 1336 (1991). We affirmed that injunction in 1992, *see* 961 F.2d 667, and the district court proceeded to determine whether WGN could carry even more games—and whether the NBA could impose a "tax" on the games broadcast to a national audience, for which other superstations have paid a pretty penny to the league. After holding a nine-week trial and receiving 512 stipulations of fact, the district court made a 30–game allowance permanent, 874 F.Supp. 844 (1995), and held the NBA's fee excessive, 1995–2 Trade Cas. para. 71,253. Both sides appeal. The Bulls want to broadcast 41 games per year over WGN; the NBA contends that the antitrust laws allow it to fix a lower number (15 or 20) and to collect the tax it proposed. With apologies to both sides, we conclude that they must suffer through still more litigation.

Our 1992 opinion rejected the league's defense based on the Sports Broadcasting Act, 15 U.S.C. §§ 1291–95, but our rationale implied that the NBA could restructure its contracts to take advantage of that statute. 961 F.2d at 670–72. In 1993 the league tried to do so, signing a contract that transfers all broadcast rights to the National Broadcasting Company. NBC shows only 26 games during the regular season, however, and the network contract allows the league and its teams to permit telecasts at other times. Every team received the right to broadcast all 82 of its regular-season games (41 over the air, 41 on cable), unless NBC telecasts a given contest. The NBA–NBC contract permits the league to exhibit 85 games per year on superstations. Seventy were licensed to the Turner stations (TBS and TNT), leaving 15 potentially available for WGN to license from the league. It disdained the opportunity. The Bulls sold 30 games directly to WGN, treating these as over-the-air broadcasts authorized by the NBC contract—not to mention the district court's injunction. The Bulls' only concession (perhaps more to

the market than to the league) is that WGN does not broadcast a Bulls game at the same time as a basketball telecast on a Turner superstation.

■ Back in 1991 and 1992, the parties were debating whether the NBA's television arrangements satisfied § 1 of the Sports Broadcasting Act, 15 U.S.C. § 1291. We held not, because the Act addresses the effects of "transfers" by a "league of clubs," and the NBA had prescribed rather than "transferred" broadcast rights. The 1993 contract was written with that distinction in mind. The league asserted title to the copyright interests arising from the games and transferred all broadcast rights to NBC; it received some back, subject to contractual restrictions. Section 1 has been satisfied. But the league did not pay enough attention to § 2, 15 U.S.C. § 1292, which reads:

> Section 1291 of this title shall not apply to any joint agreement described in the first sentence in such section which prohibits any person to whom such rights are sold or transferred from televising any games within any area, except within the home territory of a member club of the league on a day when such club is playing at home.

The NBA–NBC contract permits each club to license the broadcast of its games, and then, through the restriction on superstation broadcasts, attempts to limit telecasts to the teams' home markets. Section 2 provides that this makes § 1 inapplicable, so the Sports Broadcasting Act leaves the antitrust laws in force.

Our prior opinion observed that the Sports Broadcasting Act, as a special-interest exception to the antitrust laws, receives a beady-eyed reading. A league has to jump through every hoop; partial compliance doesn't do the trick. The NBA could have availed itself of the Sports Broadcasting Act by taking over licensing and by selling broadcast rights in the Bulls' games to one of the many local stations in Chicago, rather than to WGN. The statute offered other options as well. Apparently the league did not want to use them, in part for tax reasons and in part because it sought to avoid responsibilities that come from being a licensor, rather than a regulator, of telecasts. Such business deci-

sions are understandable and proper, but they have consequences under the Sports Broadcasting Act. By signing a contract with NBC that left the Bulls, rather than the league, with the authority to select the TV station that would broadcast the games, the NBA made its position under the Sports Broadcasting Act untenable. For as soon as the Bulls picked WGN, any effort to control cable system retransmission of the WGN signal tripped over § 2. The antitrust laws therefore apply, and we must decide what they have to say about the league's effort to curtail superstation transmissions.

Three issues were left unresolved in 1992. One was whether the Bulls and WGN, as producers, suffer antitrust injury. 961 F.2d at 669–70. The NBA has not pursued this possibility, and as it is not jurisdictional (plaintiffs suffer injury in fact), we let the question pass. The other two issues are related. We concluded in 1992 that the district court properly condemned the NBA's superstation rule under the quick-look version of the Rule of Reason, see *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), because (a) the league did not argue that it should be treated as a single entity, and (b) the anti-free-riding justification for the superstation rule failed because a fee collected on nationally telecast games would compensate other teams (and the league as a whole) for the value of their contributions to the athletic contests being broadcast. 961 F.2d at 672–76. Back in the district court, the NBA argued that it is entitled to be treated as a single firm and therefore should possess the same options as other licensors of entertainment products; outside of court, the league's Board of Governors adopted a rule requiring any club that licenses broadcast rights to superstations to pay a fee based on the amount the two Turner stations pay for games they license directly from the league.

Plaintiffs say that the single-entity argument was forfeited by its omission from the first appeal, but we think not. As our 1992 opinion observed, the case went to initial trial and decision within seven weeks, 961 F.2d at 676, a salutary development made possible in

part by judicial willingness to entertain in subsequent rounds of the case arguments that could not be fully developed in such short compass. If defendants in complex cases feared that any arguments omitted from the first phase of the case would be lost forever, they would drag their heels in order to ensure that nothing was overlooked, a step that would benefit no one. Cf. *Schering Corp. v. Illinois Antibiotics Co.*, 89 F.3d 357 (7th Cir.1996). That is why we noted that the argument would be available in the ensuing stages of the case, 961 F.2d at 672–73, and why the district court properly entertained and resolved it on the merits.

■ The district court was unimpressed by the NBA's latest arguments. It held that a sports league should not be treated as a single firm unless the teams have a "complete unity of interest"—which they don't. The court also held the fee to be invalid. Our opinion compelled the judge to concede that a fee is proper in principle. 961 F.2d at 675–76. But the judge thought the NBA's fee excessive. Instead of starting with the price per game it had negotiated with Turner (some $450,000), and reducing to account for WGN's smaller number of cable outlets, as it did, the judge concluded that the league should have started with the advertising revenues WGN generated from retransmission on cable (the "outer market revenues"). Then it should have cut this figure in half, the judge held, so that the Bulls could retain "their share" of these revenues. The upshot: the judge cut the per game fee from roughly $138,000 to $39,400.

■ The district court's opinion concerning the fee reads like the ruling of an agency exercising a power to regulate rates. Yet the antitrust laws do not deputize district judges as one-man regulatory agencies. The core question in antitrust is output. Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem. A high price is not itself a violation of the Sherman Act. See *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 9–10, 19–20, 22 n. 40, 99 S.Ct. 1551, 1557–58, 1562–63, 1564 n. 40, 60 L.Ed.2d 1 (1979); *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir.1984). WGN and the Bulls argue that the league's fee is excessive, unfair, and the like. But they do not say that it will reduce output. They plan to go on broadcasting 30 games, more if the court will let them, even if they must pay $138,000 per telecast. Although the fee exceeds WGN's outer-market revenues, the station evidently obtains other benefits—for example, (i) the presence of Bulls games may increase the number of cable systems that carry the station, augmenting its revenues 'round the clock; (ii) WGN slots into Bulls games ads for its other programming; and (iii) many viewers will keep WGN on after the game and watch whatever comes next. Lack of an effect on output means that the fee does not have antitrust significance. Once antitrust issues are put aside, how much the NBA charges for national telecasts is for the league to resolve under its internal governance procedures. It is no different in principle from the question how much (if any) of the live gate goes to the visiting team, who profits from the sale of cotton candy at the stadium, and how the clubs divide revenues from merchandise bearing their logos and trademarks. Courts must respect a league's disposition of these issues, just as they respect contracts and decisions by a corporation's board of directors. *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527 (7th Cir.1978); cf. *Baltimore Orioles, Inc. v. Major League Baseball Players Association*, 805 F.2d 663 (7th Cir.1986).

According to the league, the analogy to a corporate board is apt in more ways than this. The NBA concedes that it comprises 30 juridical entities—29 teams plus the national organization, each a separate corporation or partnership. The teams are not the league's subsidiaries; they have separate ownership. Nonetheless, the NBA submits, it functions as a single entity, creating a single product ("NBA Basketball") that competes with other basketball leagues (both college and professional), other sports ("Major League Baseball", "college football"), and other entertainments such as plays, movies, opera, TV shows, Disneyland, and Las Vegas. Separate ownership of the clubs promotes local boosterism, which increases interest; each ownership group also has a powerful

incentive to field a better team, which makes the contests more exciting and thus more attractive. These functions of independent team ownership do not imply that the league is a cartel, however, any more than separate ownership of hamburger joints (again useful as an incentive device, see Benjamin Klein & Lester F. Saft, *The Law and Economics of Franchise Tying Contracts*, 28 J.L. & Econ. 345 (1985)) implies that McDonald's is a cartel. Whether the best analogy is to a system of franchises (no one expects a McDonald's outlet to compete with other members of the system by offering pizza) or to a corporate holding company structure (on which *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)) does not matter from this perspective. The point is that antitrust law permits, indeed encourages, cooperation inside a business organization the better to facilitate competition between that organization and other producers. To say that participants in an organization may cooperate is to say that they may control what they make and how they sell it: the producers of *Star Trek* may decide to release two episodes a week and grant exclusive licenses to show them, even though this reduces the number of times episodes appear on TV in a given market, just as the NBA's superstation rule does.

The district court conceded this possibility but concluded that all cooperation among separately incorporated firms is forbidden by § 1 of the Sherman Act, except to the extent *Copperweld* permits. *Copperweld*, according to the district court, "is quite narrow, and rests solely upon the fact that a parent corporation and its wholly-owned subsidiary have a 'complete unity of interest'" (quoting from 467 U.S. at 771, 104 S.Ct. at 2741). Although that phrase appears in *Copperweld*, the Court offered it as a statement of fact about the parent-subsidiary relation, not as a proposition of law about the limits of permissible cooperation. As a proposition of law, it would be silly. Even a single firm contains many competing interests. One division may make inputs for another's finished goods. The first division might want to sell its products directly to the market, to maximize income (and thus the salary and bonus of the

division's managers); the second division might want to get its inputs from the first at a low transfer price, which would maximize the second division's paper profits. Conflicts are endemic in any multi-stage firm, such as General Motors or IBM, see Robert G. Eccles, *Transfer Pricing as a Problem of Agency, in Principals and Agents: The Structure of Business* 151 (Pratt & Zeckhauser eds. 1985), but they do not imply that these large firms must justify all of their acts under the Rule of Reason. Or consider a partnership for the practice of law (or accounting): some lawyers would be better off with a lockstep compensation agreement under which all partners with the same seniority have the same income, but others would prosper under an "eat what you kill" system that rewards bringing new business to the firm. Partnerships have dissolved as a result of these conflicts. Yet these wrangles—every bit as violent as the dispute among the NBA's teams about how to generate and divide broadcast revenues—do not demonstrate that law firms are cartels, or subject to scrutiny under the Rule of Reason their decisions about where to open offices or which clients to serve.

*Copperweld* does not hold that only conflict-free enterprises may be treated as single entities. Instead it asks why the antitrust laws distinguish between unilateral and concerted action, and then assigns a parent-subsidiary group to the "unilateral" side in light of those functions. Like a single firm, the parent-subsidiary combination cooperates internally to increase efficiency. Conduct that "deprives the marketplace of the independent centers of decisionmaking that competition assumes", 467 U.S. at 769, 104 S.Ct. at 2740, without the efficiencies that come with integration inside a firm, go on the "concerted" side of the line. And there are entities in the middle: "mergers, joint ventures, and various vertical agreements" (*id.* at 768, 104 S.Ct. at 2740) that reduce the number of independent decisionmakers yet may improve efficiency. These are assessed under the Rule of Reason. We see no reason why a sports league *cannot* be treated as a single firm in this typology. It produces a single product; cooperation is essential (a

league with one team would be like one hand clapping); and a league need not deprive the market of independent centers of decision-making. The district court's legal standard was therefore incorrect, and a judgment resting on the application of that standard is flawed.

Whether the NBA itself is more like a single firm, which would be analyzed only under § 2 of the Sherman Act, or like a joint venture, which would be subject to the Rule of Reason under § 1, is a tough question under *Copperweld.* It has characteristics of both. Unlike the colleges and universities that belong to the National Collegiate Athletic Association, which the Supreme Court treated as a joint venture in *NCAA,* the NBA has no existence independent of sports. It makes professional basketball; only it can make "NBA Basketball" games; and unlike the NCAA the NBA also "makes" teams. After this case was last here the NBA created new teams in Toronto and Vancouver, stocked with players from the 27 existing teams plus an extra helping of draft choices. All of this makes the league look like a single firm. Yet the 29 clubs, unlike GM's plants, have the right to secede (wouldn't a plant manager relish that!), and rearrange into two or three leagues. Professional sports leagues have been assembled from clubs that formerly belonged to other leagues; the National Football League and the NBA fit that description, and the teams have not surrendered their power to rearrange things yet again. Moreover, the league looks more or less like a firm depending on which facet of the business one examines. See Phillip E. Areeda, 7 *Antitrust Law* para. 1478d (1986). From the perspective of fans and advertisers (who use sports telecasts to reach fans), "NBA Basketball" is one product from a single source even though the Chicago Bulls and Seattle Supersonics are highly distinguishable, just as General Motors is a single firm even though a Corvette differs from a Chevrolet. But from the perspective of college basketball players who seek to sell their skills, the teams are distinct, and because the human capital of players is not readily transferable to other sports (as even Michael Jordan learned) the league looks more like a group of firms acting as a monopsony. That

is why the Supreme Court found it hard to characterize the National Football League in *Brown v. Pro Football, Inc.,* —— U.S. ——, ——, 116 S.Ct. 2116, 2126, 135 L.Ed.2d 521 (1996): "the clubs that make up a professional sports league are not completely independent economic competitors, as they depend upon a degree of cooperation for economic survival.... In the present context, however, that circumstance makes the league more like a single bargaining employer, which analogy seems irrelevant to the legal issue before us." To say that the league is "more like a single bargaining employer" than a multi-employer unit is not to say that it necessarily is one, for every purpose.

The league wants us to come to a conclusion on this subject (six years of litigation is plenty!) and award it the victory. Yet as we remarked in 1992, "[c]haracterization is a creative rather than exact endeavor." 961 F.2d at 672. The district court plays the leading role, followed by deferential appellate review. We are not authorized to announce and apply our own favored characterization unless the law admits of only one choice. The Supreme Court's ambivalence in *Brown,* like the disagreement among judges on similar issues, implies that more than one characterization is possible, and therefore that the district court must revisit the subject using the correct legal approach.

Most courts that have asked whether professional sports leagues should be treated like single firms or like joint ventures have preferred the joint venture characterization. E.g., *Sullivan v. NFL,* 34 F.3d 1091 (1st Cir.1994); *North American Soccer League v. NFL,* 670 F.2d 1249 (2d Cir.1982); *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1179 (D.C.Cir.1978). But Justice Rehnquist filed a strong dissent from the denial of certiorari in the soccer case, arguing that "the league competes as a unit against other forms of entertainment", *NFL v. North American Soccer League,* 459 U.S. 1074, 1077, 103 S.Ct. 499, 500, 74 L.Ed.2d 639 (1982), and the fourth circuit concluded that the Professional Golf Association should be treated as one firm for antitrust purposes, even though that sport is less economically integrated than the NBA. *Seabury Management, Inc. v. PGA of*

*America, Inc.,* 878 F.Supp. 771 (D.Md.1994), affirmed in relevant part, 52 F.3d 322 (4th Cir.1995). Another court of appeals has treated an electric cooperative as a single firm, *Mt. Pleasant v. Associated Electric Co-operative,* 838 F.2d 268 (8th Cir.1988), though the co-op is less integrated than a sports league. These cases do not yield a clear principle about the proper characterization of sports leagues—and we do not think that *Copperweld* imposes one "right" characterization. Sports are sufficiently diverse that it is essential to investigate their organization and ask *Copperweld's* functional question one league at a time—and perhaps one facet of a league at a time, for we do not rule out the possibility that an organization such as the NBA is best understood as one firm when selling broadcast rights to a network in competition with a thousand other producers of entertainment, but is best understood as a joint venture when curtailing competition for players who have few other market opportunities. Just as the ability of McDonald's franchises to coordinate the release of a new hamburger does not imply their ability to agree on wages for counter workers, so the ability of sports teams to agree on a TV contract need not imply an ability to set wages for players. See Jesse W. Markham & Paul V. Teplitz, *Baseball Economics and Public Policy* (1981); Arthur A. Fleisher III, Brian L. Goff & Robert D. Tollison, *The National Collegiate Athletic Association: A Study in Cartel Behavior* (1992).

■ However this inquiry may come out on remand, we are satisfied that the NBA is sufficiently integrated that its superstation rules may not be condemned without analysis under the full Rule of Reason. We affirmed the district court's original injunction after applying the "quick look" version because the district court had characterized the NBA as something close to a cartel, and the league had not then made a *Copperweld* argument. After considering this argument, we conclude that when acting in the broadcast market the NBA is closer to a single firm than to a group of independent firms. This means that plaintiffs cannot prevail without establishing that the NBA possesses power in a relevant market, and that its exercise of this power has injured consumers. Even in the NCAA case, the first to use a bobtailed Rule of Reason, see Diane P. Wood, *Antitrust 1984: Five Decisions in Search of a Theory,* 1984 Sup.Ct.Rev. 69, 110–12, the Court satisfied itself that the NCAA possesses market power. The district court had held that there is a market in college football telecasts on Saturday afternoon in the fall, a time when other entertainments do not flourish but college football dominates. Only after holding that this was not clearly erroneous did the Court cast any burden of justification on the NCAA. 468 U.S. at 111–13, 104 S.Ct. at 2965–67; see also *International Boxing Club v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959).

■ Substantial market power is an indispensable ingredient of every claim under the full Rule of Reason. *Digital Equipment Corp. v. Uniq Digital Technologies, Inc.,* 73 F.3d 756, 761 (7th Cir.1996); *Sanjuan v. American Board of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994); *Hardy v. City Optical, Inc.,* 39 F.3d 765, 767 (7th Cir.1994); *Chicago Professional Sports Limited Partnership v. National Basketball Association,* 961 F.2d 667, 673 (7th Cir.1992); *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 670–74 (7th Cir.1985); *Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Development Co.,* 758 F.2d 203, 210 (7th Cir.1985). During the lengthy trial of this case, the NBA argued that it lacks market power, whether the buyers are understood as the viewers of games (the way the district court characterized things in *NCAA*) or as advertisers, who use games to attract viewers (the way the Supreme Court characterized a related market in *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)). College football may predominate on Saturday afternoons in the fall, but there is no time slot when NBA basketball predominates. The NBA's season lasts from November through June; games are played seven days a week. This season overlaps all of the other professional and college sports, so even sports fanatics have many other options. From advertisers' perspective—likely the right one, because advertisers are the ones who actually pay for telecasts—the mar-

ket is even more competitive. Advertisers seek viewers of certain demographic characteristics, and homogeneity is highly valued. A homogeneous audience facilitates targeted ads: breakfast cereals and toys for cartoon shows, household appliances and detergents for daytime soap operas, automobiles and beer for sports. If the NBA assembled for advertisers an audience that was uniquely homogeneous, or had especially high willingness-to-buy, then it might have market power even if it represented a small portion of air-time. The parties directed considerable attention to this question at trial, but the district judge declined to make any findings of fact on the subject, deeming market power irrelevant. As we see things, market power is irrelevant only if the NBA is treated as a single firm under *Copperweld;* and given the difficulty of that issue, it may be superior to approach this as a straight Rule of Reason case, which means starting with an inquiry into market power and, if there is power, proceeding to an evaluation of competitive effects.

Perhaps this can be accomplished using the materials in the current record. Although the judge who presided at the trial died earlier this year, the parties may be willing to agree that an assessment of credibility is unnecessary, so that a new judge could resolve the dispute after reviewing the transcript, exhibits, and stipulations, and entertaining argument. See Fed.R.Civ.P. 63. At all events, the judgment of the district court is vacated, and the case is remanded for proceedings consistent with this opinion. Pending further proceedings in the district court or agreement among the parties, the Bulls and WGN must respect the league's (and the NBC contract's) limitations on the maximum number of superstation telecasts.

CUDAHY, Circuit Judge, concurring:

Although I agree with the majority's firm conclusion that the "quick look" doctrine does not apply to these complex facts, I must indicate some differences in significant matters that are reached in the course of the majority opinion. Thus, in arriving at its conclusion that a full Rule of Reason analysis is required, the majority seems to be extra-polating from its discussion of whether the NBA may be a "single entity." Classification as a "single entity" means immunity from Sherman Act, § 1, considerations, a distinction much more drastic than the conclusion that the conduct in question here deserves a "quizzical look" rather than a mere "quick look." So, although it is not entirely clear, the majority seems to be saying that, since the NBA may be a single entity, its conduct certainly merits more than a quick look. Perhaps so, but, since the single entity question is unresolved, I would prefer to address the problem from a slightly different direction.

For the "quick look" approach should have a narrow application, reflecting its recent and sharply delimited origin in the NCAA case. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). That case, involving a loose alliance of colleges which had agreed on price and output restrictions on broadcast of their football games, held that under some circumstances a full analysis of market power is not required to determine that an agreement is anticompetitive. This framework should not be extended to the more highly integrated and economically unitary NBA.

The colleges which made up the NCAA were entirely separate economic entities, competing with each other in many areas unrelated to their athletic encounters. There is, of course, a sort of continuum of economic integration, with entities at different points along the continuum warranting differing levels of antitrust concern. At one end are loose alliances of economic actors having independent concerns (like the NCAA), the anticompetitive nature of whose agreements is obvious from a "quick look." At the other end are fully-integrated entities in which the economic interests of the participants are so completely aligned that antitrust scrutiny of their policies is unnecessary except where § 2 of the Sherman Act is violated. In the center is the broad range of organizations (generally like the NBA) whose separate constituents are individually owned but are closely but not completely tied economically to their organizations. These entities are

capable of anticompetitive agreements, but a full Rule of Reason analysis is necessary to ensure that productive cooperation is not mistaken for anticompetitive conduct. Single entity aside, there is certainly enough concern here for the efficiency of the league as a competitor in the entertainment market to require full Rule of Reason analysis.

On a more clear-cut point, I think it was appropriate for Judge Will to examine the size of the NBA's fee for the WGN broadcasts of Bulls games. In this connection, the majority rejects considerations of fairness "and the like" and asserts that, "The core question in antitrust is output." Maj. Op. at 597. Under the reductive view that prevails in antitrust matters, this somewhat grating aphorism appears to be correct. If efficiency (or consumer welfare) is the be-all and end-all, more seems to be better no matter how the more is distributed. But taking these principles as a given, it is still difficult for me to understand how output can be disjoined from cost under the circumstances of this case. In fact, Judge Will found as a fact that, "[the NBA's proposed fee] may well at some future date decrease output and distribution of Bulls games on WGN ...." Dist. Ct. Findings of Fact, Conclusions of Law and Opinion, NBA App. at 77a. But, particularly since output is currently constrained to 30 games, rather than whatever the market would produce, it is difficult to ascertain whether the fee is high enough to reduce output below the competitive level. Since it is not clear to me that the magnitude of Judge Will's adjustment was justified by antitrust considerations alone, I would include this issue with other matters to be considered on remand.

That said, I turn to the single entity issue, where the discussion of the majority is deserving of comment both as to substance and to procedure. My first reservation is procedural and concerns whether this issue may be reached at all. The majority announces an exception—without precedent to my knowledge—from the usual rules of waiver of issues on appeal. The exception applies, according to the majority, to "defendants in complex cases" without elaboration. Why we should have more forgiving policies for highly skilled and highly compensated counsel in big corporate cases than for pro se litigants or appointed counsel of perhaps lesser qualification is certainly unclear to me. Our earlier opinion in this case states that "the NBA did not contend in the district court that the NBA is a single entity, let alone that it is a single entity as a matter of law." *Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n,* 961 F.2d 667, 673 (7th Cir.1992), cert. denied, 506 U.S. 954, 113 S.Ct. 409, 121 L.Ed.2d 334 (1992). We also stated that:

> Characterization is a creative rather than exact endeavor. Appellate review is accordingly deferential. The district court held a trial, heard the evidence, and concluded that the best characterization of the NBA is the third we have mentioned: a joint venture in the production of games but more like a cartel in the sale of its output. Whether this is the best characterization of professional sports is a subject that has divided courts and scholars for some years, making it hard to characterize the district judge's choice as clear error.

*Id.* at 672. No one seems to have argued that the basic structure of the NBA has changed since that opinion. I think, therefore, that, despite dicta in our earlier opinion speculating that "[p]erhaps the parties will join issue more fully [regarding the single entity status of the NBA] in the proceedings still to come in the district court," *id.* at 673, there is a real question whether we can reach the single entity issue—fascinating though it may be.

However, on the assumption that the "single entity" question may be reached (and presumably will be reached on remand) a number of considerations will be relevant. Assuming as I must that the sole goal of antitrust is efficiency or, put another way, the maximization of total societal wealth, the question whether a sports league is a "single entity" turns on whether the actions of the league have any potential to lessen *economic* competition among the separately owned

teams.[1] The fact that teams compete on the floor is more or less irrelevant to whether they compete economically—it is only their economic competition which is germane to antitrust analysis. In principle, of course, a sports league could actually be a single firm and the individual teams could be under unified ownership and management. Such a firm would, of course, be subject to scrutiny only under § 2 of the Sherman Act and not under § 1. From the point of view of wealth maximization, a league of independently-owned teams, if it is no more likely than a single firm to make inefficient management decisions, should be treated as a single entity. The single entity question thus would boil down to "whether member clubs of a sports league have legitimate economic interests of their own, independent of the league and each other." *Sports Leagues Revisited* at 127. It follows that a sports league, no matter what its ownership structure, can make inefficient decisions only if the individual teams have some chance of economic gain at the expense of the league.

Another form of the same question is whether a sports league is more like a single firm or like a joint venture. With efficiency the sole criterion, a joint venture warrants scrutiny for at least two reasons—(1) the venture could possess market power with respect to the jointly produced product (essentially act like a single firm with monopoly power) or (2) the fact that the venturers remain competitors in other arenas might either distort the way the joint product is managed or allow the venturers to use the joint product as a smoke-screen behind which to cut deals to reduce competition in the other arenas. The most convincing "single entity" argument involving the NBA is that the teams produce only the joint product of "league basketball" and that there is thus no significant economic competition between them. NBA Br. at 25–27. If this is the case, the argument goes, type (2) concerns drop out and only type (1) concerns remain. · Type (1) concerns, of course, are exactly those appropriate for § 2 analysis of a single firm.

There are, however, flaws in this single entity argument. The assumption underlying it is that league sports are a different and more desirable product than a disorganized collection of independently arranged games between teams. For this reason, it is contended that joining sports teams into a league is efficiency-enhancing and desirable. I will accept this premise.[2] It is perhaps true, as argued by the NBA and many commentators, that sports are different from many joint ventures because the individual teams cannot, even in principle, produce the product—league sports. However, the fact that cooperation is necessary to produce league basketball does not imply that the league will necessarily produce its product in the most efficient fashion. There is potential for inefficient decisionmaking regarding the joint product of "league basketball" even when the individual teams engage in no economic activity *outside* of the league. This potential arises because the structure of the league is such that all "owners" of the league must be "owners" of individual teams and decisions are made by a vote of the teams. This means that the league will not necessarily make efficient decisions about the number of teams fielded or, more generally, the competitive balance among teams. Thus, the fact that several teams are required to make a league does not necessarily imply that the current makeup of the league is the most desirable or "efficient" one.

The NBA's justification for its restriction of Bulls broadcasts centers on the need to maintain a competitive balance among teams.

1. *See, e.g.*, Michael S. Jacobs, *Professional Sports Leagues, Antitrust and the Single–Entity Theory: a Defense of the Status Quo*, 67 Ind.L.J. 25 (1991); Gary R. Roberts, *The Antitrust Status of Sports Leagues Revisited*, 64 Tul.L.Rev. 117 (1989); Myron C. Grauer, *The Use and Misuse of the Term "Consumer Welfare": Once More to the Mat on the Issue of Single Entity Status for Sports Leagues Under Section 1 of the Sherman Act*, 64 Tul.L.Rev. 71 (1989); Lee Goldman, *Sports, Antitrust, and the Single Entity Theory*, 63 Tul.L.Rev. 751 (1989); Gary R. Roberts, *Sports Leagues and the Sherman Act: The Use and Abuse of Section 1 to Regulate Restraints on Intraleague Rivalry*, 32 UCLA L.Rev. 219 (1984), for discussions of this issue.

2. But the Green Bay Packers and the Chicago Bears played, presumably before enthusiastic crowds, before there was a National Football League.

Such a balance is needed to ensure that the league provides high quality entertainment throughout the season so as to optimize competition with other forms of entertainment. Competitive balance is not the only contributor to the entertainment value of NBA basketball, however. Fan enjoyment of league sports depends on both the opportunity to identify with a local or favorite team and the thrill of watching the best quality of play. A single firm owning all of the teams would presumably arrange for the number of teams and their locations efficiently to maximize fan enjoyment of the league season. There is, however, no reason to expect that the current team owners will necessarily make such decisions efficiently, given their individual economic interests in the financial health of their own teams.

It's not surprising that far-flung fans want to watch the Bulls' superstars on a superstation. The NBA argues that the broadcasting of more Bulls games to these fans will disturb the competitive balance among teams. However, one can also speculate that, since sports viewing has become more of a television activity than an "in the flesh" activity, these fans might prefer to have a league composed of fewer, better teams (like the Bulls). If this were the case, league policies designed to shore up *all* of the current teams would be inefficient. The point, of course, is not that this speculation is necessarily correct, but that the efficient number of teams (or, more generally, the efficient competitive balance) may not be obtained as a matter of course given the current league ownership framework.

The team owners thus retain independent economic interests. This would be the case even if they did not compete for the revenues of the league. Teams do compete for broadcast revenues, however. "A conflicting economic interest between the league and an individual club can exist only when league revenues are distributed unequally among the member clubs based on club participation in the games generating the revenue." Sports Leagues and the Sherman Act at 297–99. When teams receive a disproportionate share of the broadcast revenues generated by their own games, such a situation exists.

The analysis of this issue is tricky, however, since decisions about how to allocate broadcasting revenues are made by the league. It may be that "member clubs of a league do not have any legitimate independent economic interests in the league product" and "each team has an ownership interest in every game" (including an equal a priori ownership interest in the broadcast rights to every game). Sports Leagues Revisited at 135–36. If this assumption is correct, then whatever arrangements for revenue distribution the league decides to make will be, like bonuses to successful salespeople in an ordinary firm, presumptively efficient. If, however, broadcast rights inure initially to the two teams participating in a particular game and if, as is certainly the case, some games are more attractive to fans than others, the league cannot be presumed to have made decisions allocating those broadcast revenues efficiently.

The analogy, within the context of an ordinary firm, is to allow the salespeople to vote on the bonuses each is to get. Each salesperson has some incentive, of course, to promote the overall efficiency of the firm on which his or her salary, or perhaps the value of his or her firm stock, depends and therefore to award the larger bonuses to the most productive salespersons. However, in this scenario each salesperson has *two* ways of maximizing personal wealth—increasing the overall efficiency of the firm and redistributing income within the firm.[3] The result of

---

**3.** Those favoring the single entity treatment of sports leagues frequently compare them to law firms, making the argument that sports leagues are like law firms, law firms are single entities, therefore sports leagues are single entities. *See, e.g.,* Myron C. Grauer, *Recognition of the National Football League as a Single Entity Under Section 1 of the Sherman Act: Implications of the Consumer Welfare Model,* 82 Mich.L.Rev. 1, 23–35 (1983); Maj. Op. at 597–98. This argument is only valid, however, if law firms should be treated as single entities. If law firms do, in fact, have some of the same potential for inefficiencies as sports leagues because of the diverse economic interests of the partners, the economically correct solution is still to treat sports leagues as joint ventures. A mere analogy to law firms is not convincingly invoked by those seeking to defend their arguments on purely economic (rather than precedential) grounds.

the vote might not be to distribute bonuses in the most efficient fashion. The potential for this type of inefficiency is particularly great when, as with the NBA, the league is "the only game in town" so that a team does not have the option of going elsewhere if it is not receiving revenues commensurate with its contribution to the overall league product.[4] In any event, a group of team owners who do not share all revenues from all games might well make decisions that do not maximize the profit of the league as a whole.[5]

As this discussion demonstrates, determining whether the potential for inefficient decisionmaking survives within a joint venture because of the independent economic interests of the partners is extraordinarily complex and confusing. For this reason, a simple, if not courageous, way out of the problem might be to establish a legal presumption that a single entity cannot exist without single ownership. To avoid the complexities and confusions of attempted analysis, one might simply ordain that combinations that lack diverse economic interests should opt for joint ownership of a single enterprise to avoid antitrust problems. On the other hand, judges may want to play economist to the extent of resisting simplifying assumptions.

In any event, sports leagues argue that they must maintain independent ownership of the teams because separate ownership enhances the appearance of competitiveness demanded by fans. But the leagues cannot really expect the courts to aid them in convincing consumers that competition exists if it really does not. If consumers want economic competition between sports teams, then independent ownership and preservation of independent economic interests is likely an efficient choice for a sports league. But that choice, as with other joint ventures, brings with it the attendant antitrust risks. The NBA cannot have it both ways.

Relating all of this to the majority's treatment of the single entity issue, I see two problems with the majority analysis. First, as already noted, divorcing the question of single entity from the question of ownership is likely to lead to messy and inconsistent application of antitrust law. The bottom line may be that the inquiry into whether separate economic interests are maintained by the participants in a joint enterprise is likely to be no easier than a full Rule of Reason analysis.

Second, some of the majority's discussion of independent interests is puzzling. The majority contends that the district court "concluded that all cooperation among separately incorporated firms is forbidden by § 1 of the Sherman Act, except to the extent *Copperweld* permits." Maj. Op. at 598, citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984). *Copperweld* concluded that a parent corporation and its wholly-owned subsidiary have a "complete unity of interest" and hence should be treat-

---

Applying the same logic in reverse, there is considerable precedent for treating sports leagues as joint ventures. *Nat'l Collegiate Athletic Assoc. v. Bd. of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *Sullivan v. National Football League*, 34 F.3d 1091, 1099 (1st Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995); *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1388–90 (9th Cir.1984), cert. denied, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984); *North American Soccer League v. NFL*, 670 F.2d 1249, 1252 (2d Cir.1982), cert. denied, 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1179 (D.C.Cir.1978); *Levin v. National Basketball Ass'n*, 385 F.Supp. 149, 150 (S.D.N.Y.1974). Therefore, one might equally well argue that sports leagues have never been treated as single entities and, to the extent that law firms are like

them, law firms should not be treated as single entities either.

**4.** The hypothetical example of a team taking its broadcast rights elsewhere does seem to suggest, however, that broadcast rights are at bottom the property of the teams participating in a given game. Indeed, if the team does not own the broadcast rights to the games in which it participates, it is hard to understand what it means to own a team at all.

**5.** See Herbert Hovenkamp, *Exclusive Joint Ventures and Antitrust Policy*, 1995 Colum.Bus.L.Rev. 1 (1995), for a general discussion of the ways in which joint ventures can act inefficiently either by excluding members (or, here perhaps, over-including members) or by excluding products (superstation broadcasts, perhaps?).

ed as a single entity. Here the district court simply concluded that the NBA, because it involved cooperation between separately-owned teams, was subject to antitrust *analysis*. Dist.Ct. Findings of Fact, Conclusions of Law and Opinion, NBA App. at 34a. This conclusion is a far cry from deciding that all cooperation among separately incorporated firms is *forbidden*.

I also cannot agree with the majority's analysis of the type of "unity of interest" required for single entity status. The majority states, Maj. Op. at 598, that "[e]ven a single firm contains many competing interests." The opinion goes on to cite the competition for salary and bonuses between division managers as an example. However, when *Copperweld* talks about unity of interests in the single entity context, I think it must be taken to mean unity of *economic* interests of the *decisionmakers*. *See Copperweld*, 467 U.S. at 769, 104 S.Ct. at 2740–41. A single firm does not evidence diverse *economic* interests to the outside world because final decisions are made by the owners or stockholders, who care only about the overall performance of the firm. Only because this is the case can single firms be assumed to behave in the canonical profit-maximizing fashion. The diverse interests mentioned in the majority opinion seem as irrelevant to the antitrust analysis as is the on-court rivalry between teams in the NBA.

Thus, when *Copperweld* refers to conduct that "deprives the marketplace of the independent centers of decisionmaking that competition assumes," it does not refer to "decisionmakers" whose economic independence is only potential. The antitrust issue is really whether, as a result of some cooperative venture, economic interests *which remain independent* coordinate their decisions. As *Copperweld* notes, "[t]he officers of a single firm are not separate economic actors pursuing separate economic interests...." *Id.* Therefore, their joint decisionmaking is of no antitrust concern. Employees or divisions within a firm, on the other hand, may remain separate economic actors pursuing separate economic interests but they do not make the final decisions governing the firm's operations. They may compete for shares of the

firm's revenues, but they do not decree how that revenue will be shared. Thus their conflict or cooperation does not pose antitrust issues either. Joint ventures, on the other hand, are subject to antitrust scrutiny precisely because separate economic interests *are* joined in decisionmaking, with the potential for distorted results.

As long as teams are individually owned and revenue is not shared in fixed proportion, the teams both retain independent economic interests and make decisions in concert. Where this is the case, there is a strong argument that sports leagues should be treated as joint ventures rather than single entities because there remains a potential that league policy will be made to satisfy the independent economic interests of some group of teams, rather than to maximize the overall performance of the league. Thus, it is possible, if more Bulls games were broadcast, league profits might increase. But, if the revenue from the broadcast of Bulls games goes disproportionately to the Bulls, the other league members may not vote for this more efficient result.

There may, of course, be cases in which independent ownership of the partners in a joint venture does not pose any real possibility of inefficient decisionmaking. This would be the case if the parties did not compete in any other arena and if all revenues were shared in fixed proportions among the partners. In general, however, a plausible case can be made for the proposition that independent ownership should presumptively preclude treatment as a single entity. This certainly does not mean, of course, that "all cooperation among separately incorporated firms is forbidden by § 1 of the Sherman Act," Maj. Op. at 598. It would mean only that such cooperation must ordinarily be justified under the Rule of Reason. Justification might not be more difficult than the elusive search for treatment as a single entity.