**DM RESEARCH, INC., etc.,**
**Plaintiff, Appellant,**

v.

**COLLEGE OF AMERICAN PATHOLO-GISTS and National Committee for Clinical Laboratory Standards, Defendants, Appellees.**

No. 98–1555.

United States Court of Appeals, First Circuit.

Argued Dec. 8, 1998.

Decided March 4, 1999.

Evan Slavitt with whom Andrew A. Honegger and Gadsby & Hannah LLP were on brief for appellant.

Jack R. Bierig with whom Virginia A. Seitz, Sidley & Austin, Richard A. Licht, Steven M. Richard and Tillinghast, Licht & Semonoff were on brief for appellees.

Before BOUDIN, Circuit Judge, JOHN R. GIBSON,* Senior Circuit Judge, and LYNCH, Circuit Judge.

BOUDIN, Circuit Judge.

DM Research, Inc., the plaintiff in the district court, is a Rhode Island company that for many years has been engaged in the production of reagents, which are substances used in the testing or synthesis of other products. The defendants in the district court were two organizations: the College of American Pathologists ("the College"), a nonprofit Illinois corporation comprising several hundred pathologists, and the National Committee for Clinical Laboratory Standards ("National"), a nonprofit Pennsylvania corporation representing a variety of manufacturing, testing, and other interests.

Since the case was resolved below on a motion to dismiss, we take the factual allegations of the complaint as true. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). Among other products DM Research makes is what its complaint calls "reagent grade water," a form of purified water used in clinical laboratories for various purposes. National's main role is to develop uniform standards relating to clinical laboratory testing; its standards, like those of most private standard-setting organizations, have no legal force but may be followed voluntarily or used in certification arrangements.

In 1991, National adopted a guideline document titled "Preparation and Testing of Reagent Water in the Clinical Laboratory, Approved Guideline" (2d ed. Aug.1991). The guidelines set down minimum requirements reagent water should meet, *e.g.*, as to bacterial content, pH, resistance to electrical transmission, silicate content, particulate content, and organic content. According to the complaint, one of the guidelines effectively requires complying laboratories—at least for certain procedures—to use reagent water produced using a purification system on site, rather than using bottled reagent water manufactured elsewhere. National's guidelines require just-produced water for certain laboratory tests on the ground that the resistivity of the water tends to degrade rapidly over time.

Equipment, apparently costing $1,000 or more, is available for on-site production of reagent water. Laboratories that choose to comply with the National guideline at issue now purchase such equipment instead of buying reagent water from DM Research or its competitors. In DM Research's view, National's requirement of on-site production is scientifically unjustified. The details of this scientific quarrel are not important for present purposes; we assume *arguendo* that DM Research could prove at trial that National's guideline is unnecessary.

Although the National reagent water guidelines have no legal force, the College has incorporated them into its own guidelines, which it uses in accrediting laboratories, including hospital laboratories. According to the DM Research complaint, the loss of such accreditation would, as a practical matter, be "devastating" to a laboratory. And while the complaint is quite obscure on this point, we will assume that DM Research could prove at trial that many of DM Research's potential customers have strong practical reasons for complying with the College's guidelines even though they may have no legal obligation to do so.

* Hon. John R. Gibson, of the Eighth Circuit, sitting by designation.

The complaint alleges that the effect of the National guidelines and their adoption by the College was to limit the growth in DM Research's sales of its reagent water and ultimately to force the owner of DM Research to sell the company at reduced price. The complaint charged, *inter alia,* that National and the College had conspired to restrain trade in the provision of high grade reagent water products, including bottled reagent water and water purification equipment, thereby violating section 1 of the Sherman Act, 15 U.S.C. § 1.

The complaint says that the provision of such products to laboratories constitutes a national "market," within the meaning of the antitrust laws, and solely for purposes of our decision we will assume this to be so. It also says that the acts in furtherance of the conspiracy were as follows:

> (a) the creation, adoption, and enforcement of faulty and arbitrary standards and guidelines and (b) economic threats and intimidation of certain laboratories and referring pathologists to cease or refrain from doing business with DM Research and other bottled reagent water manufacturers.

What weight is to be given to allegations of this character, and to the general charge of "conspiracy," is the central issue in this case.

The College moved to dismiss, Fed. R.Civ.P. 12(b)(6), on the ground that the complaint failed to state a claim under the Sherman Act; National moved to dismiss for this reason and for lack of personal jurisdiction and venue. DM filed an opposition but no affidavits. In a thoughtful memorandum and order, dated April 14, 1998, the district judge granted the motion to dismiss the Sherman Act count for failure to state a claim and, declining to exercise supplemental jurisdiction, *see* 28 U.S.C. § 1367, dismissed without prejudice the remaining state law claims (state antitrust, tortious interference, and defamation). *See DM Research, Inc. v. College of American Pathologists,* 2 F.Supp.2d 226 (D.R.I.1998).

■ On DM Research's appeal, our review of the district court's decision is *de novo. See Preferred Mutual Ins. Co. v. Travelers Cos.,* 127 F.3d 136, 137 (1st Cir.1997). The issue is whether the complaint states a claim under the Sherman Act, assuming the factual allegations to be true and indulging to a reasonable degree a plaintiff who has not yet had an opportunity to conduct discovery. *See Watterson,* 987 F.2d at 3. The issue turns as much on a recurring problem of civil procedure—what force is to be accorded conclusory terms in a complaint—as it does on antitrust analysis.

The governing precept, to borrow the district court's excellent summary, is that while the plaintiff's "facts" must be accepted as alleged, this does not automatically extend to "[b]ald assertions, subjective characterizations and legal conclusions," 2 F.Supp.2d at 228 (citing cases); further, as the district judge said, "the factual allegations must be specific enough to justify 'drag[ging] a defendant past the pleading threshold,' " *id.* at 228 (quoting *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988)).

■ *Gooley* 's concept of "the pleading threshold" is critical. The complaint should include "a short and plain statement" of the claim showing that the pleader is entitled to relief, Fed.R.Civ.P. 8(a), so it need not include evidentiary detail. On the other hand, the price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome. Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition.

■ In framing its Sherman Act claim, DM Research chose to treat National and the College as independent actors who "conspired" with each other to adopt and implement a scientifically unjustified restriction that foreclosed to DM Research a substantial body of customers. Conspiracy in antitrust parlance is pretty much a synonym for agreement, *see, e.g., Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 757, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and almost any agreement between independent actors that restrains competition is potentially subject to examination for "reasonableness" under section 1, *see National Soc'y of Professional Eng's v. United States,* 435 U.S.

679, 686–91, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). There are exceptions, *see, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), but none is apt here.

Whether an agreement is "unreasonable" from an antitrust standpoint is a complicated matter—much of antitrust law is devoted to it—apart from a few agreements regarded as "per se" unlawful (such as price-fixing agreements between competitors). *See U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir.1993). Let us suppose National and the College could not lawfully "agree" on the adoption of a faulty standard that excluded DM Research from access to important customers. Literally read, the complaint does allege such a conspiracy, albeit in conclusory terms.

But no antitrust lawyer could help but ask almost immediately *why* National and the College would conspire. It is easy enough to understand why two manufacturers might agree to charge above-market prices; if taken together they have market power, the agreement can increase their profits. *See United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). The complaint here does allege that some National members make or are otherwise interested in the manufacture of water purification equipment. But, without more detail, it is highly implausible to suppose that the College or its members have any reason to "agree" with National to adopt a faulty standard whose main effect would be to raise costs for laboratories that found it cheaper to buy bottled reagent water than to make it on site.

DM Research asserts that the district court was required to accept, for purposes of the motion to dismiss, that such a conspiracy existed, however implausible it might be. But terms like "conspiracy," or even "agreement," are border-line: they might well be

sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, *cf. Interstate Circuit v. United States*, 306 U.S. 208, 221–25, 59 S.Ct. 467, 83 L.Ed. 610 (1939)—but a court is not required to accept such terms as a sufficient basis for a complaint. The case law on this point is ample.[1]

This is no technical mouse-trap for an unduly terse plaintiff. Litigation, even at the pleading stage, is an on-going process. Once DM Research knew the thrust of the defendants' arguments for dismissal, it was perfectly free to respond to the motion to dismiss by providing the district court with additional facts to make its complaint concrete and plausible. If DM Research had responded with an amendment to the complaint or even with an affidavit setting forth such detail, the district court certainly would not have dismissed the case out of hand. Yet nothing in DM Research's opposition, or even its brief on appeal, adds anything factual to underpin its complaint.

■ Occasionally, an implausible conclusory assertion may turn out to be true. Perhaps for some unknown reason National and the College collaborated in adopting a faulty standard. But the discovery process is not available where, at the complaint stage, a plaintiff has nothing more than unlikely speculations. While this may mean that a civil plaintiff must do more detective work in advance, the reason is to protect society from the costs of highly unpromising litigation.

DM Research's brief bears out the district court's concerns. It speculates that excluding DM Research might *lower* the price of purification equipment for reagent water. In fact, excluding competitors of good substitute products (here, bottled reagent water) almost always tends to stabilize or raise the price of substitutes. DM Research says that the health care industry is a "counter-intuitive" world of its own, "[h]ighly regulated and idiosyncratic," but DM Research does not explain *how* this makes its conspiracy more

1. *See, e.g., Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989); *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir.1992); *see also* 5A Wright & Miller, *Federal Practice and Procedure* § 1357, at 317–18 (2d ed.1990).

plausible. And it asserts, unhelpfully, that "[o]ther [College] and [National] members may benefit for other, yet unknown reasons."

DM Research points out that individuals or companies sometimes do act contrary to their own interest. No doubt this is true and, if DM Research had alleged *facts* indicating an agreement—instead of merely asserting a conspiracy in conclusory terms—improbability would not normally warrant dismissal for failure to state a claim (there may be extreme exceptions). But improbability is ample reason for the court to demand something more than mere conclusions as to conspiracy, which is all that DM Research has offered here.

■ What we have said thus far, very much echoing the district court, disposes of the Sherman Act claim as it has been framed by DM Research itself. But the complaint also charged that the guidelines are scientifically unsupported and adversely affected DM Research's ability to sell high grade reagent water. Even if the defendants did not conspire, are these allegations not enough to frame a complaint against each of the defendants separately? If so, we might be more hesitant to affirm the dismissal merely because the theory was imperfectly expressed, *cf. Vartanian v. Monsanto Co.*, 14 F.3d 697, 702 (1st Cir.1994), even though the argument might technically be forfeited on appeal, *see Nichols v. Cadle Co.*, 139 F.3d 59, 64 (1st Cir.1998).

At first blush, separate claims against National or the College might appear to be foreclosed because each is a corporation, and under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), a corporation—although it may comprise and act through individual employees or wholly owned subsidiaries—is not deemed able to "conspire" with itself.

*See id.* at 767–69, 104 S.Ct. 2731. This is so not *a priori*, but for policy reasons; and the policy reasons may not apply with the same force, in all circumstances, to a trade or professional association.

After all, such organizations may, in at least some of their functions, operate essentially as a means of coordinating the actions of their independent members; and in some cases their actions have been viewed as the joint actions of the members.[2] There are so many variables that no single generalization is secure. We are therefore going to assume *arguendo* that the actions of National or the College, taken separately from each other, could in the present circumstances be regarded as the product of an agreement of members of each organization operating within the framework of the single organization.

Nevertheless, it is commonplace, and often very useful, for organizations to recommend quality standards (like National) or adopt them as part of a certification process (like the College). Merely to say that the standards are disputable or have some market effects has not generally been enough to condemn them as "unreasonable" under the Sherman Act. A few cases say this explicitly, *see, e.g., Consolidated Metal Products, Inc. v. American Petroleum Inst.*, 846 F.2d 284, 294 (5th Cir.1988), but more important, something else or more extreme is generally present in the cases that have condemned quality standards as anticompetitive.

In such cases, the principal concern has been the use of standards setting as a predatory device by some competitors to injure others; normally there is a showing that the standard was deliberately distorted by competitors of the injured party, sometimes through lies, bribes, or other improper forms of influence,[3] in addition to a further showing

---

2. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988); *American Soc'y of Mechanical Eng's, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 570–74, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Chicago Professional Sports L.P. v. National Basketball Assoc.*, 95 F.3d 593, 600 (7th Cir.1996); VII areeds, *Antitrust Law* ¶ 1477 (1986).

3. *See Allied Tube*, 486 U.S. at 496–97, 108 S.Ct. 1931; *Hydrolevel*, 456 U.S. at 571–73, 102 S.Ct. 1935; *Radiant Burners v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 659–60, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (per curiam). *Compare Clamp–All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 488 (1st Cir.), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989). Standard setting can also be used to exploit consumers, *see, e.g., Federal Trade Comm'n v.*

of market foreclosure. *See* Hovenkamp, *Economics and Federal Antitrust Law* § 10.3 at 286 (1985). Without some kind of protective screen for treble damage liability, there would be few standards set since most involve disputable judgment calls.

In this case, there is no claim that the College's members compete with DM Research or at all. In the case of National, the complaint does allege that two members somehow involved in the writing of the guidelines were connected with purification equipment and that other unspecified members of National have similar interests; but it does not say that such members dominated the decision making, or bribed or lied to other members. *See Eliason Corp. v. National Sanitation Foundation,* 614 F.2d 126 (6th Cir.), *cert. denied,* 449 U.S. 826, 101 S.Ct. 89, 66 L.Ed.2d 29 (1980).

The only complaint paragraph (quoted above) that comes close to alleging improper conduct says that "the conspiracy" involved "economic threats and intimidation" of certain laboratories and caused pathologists to cease or refrain from using bottled reagent water. Once again, the phrasing is general and there are not specifics. *See Canney v. City of Chelsea,* 925 F.Supp. 58. 70 (D.Mass. 1996). Still, this claim may be more plausible if read—as its phrasing suggests—as directed not to National's framing of the standard but to its "enforcement" by the College as a requirement for membership or certification.

If the College says to a laboratory or a pathologist that membership or its certification depends on respect for the guidelines, that may well constitute an economic threat from the standpoint of the laboratory or pathologist who finds it cheaper to buy bottled water. But it is not intrinsically an antitrust violation for an organization to limit its endorsement to those who meet its published standards unless the standard itself is shown to be anticompetitive in purpose or effect. *See Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 396 (7th Cir.1993), *cert. denied,* 510 U.S. 1111, 114

*Indiana Fed'n of Dentists,* 476 U.S. 447, 459–64, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), but this

S.Ct. 1054, 127 L.Ed.2d 375 (1994). And such a showing, even to the modest extent required in a complaint, requires more than epithets.

*Affirmed.*

set of concerns is not present in this case.