# In the
# United States Court of Appeals
## For the Seventh Circuit
———————

No. 07-4006

AMERICAN NEEDLE INC.,

*Plaintiff-Appellant,*

*v.*

NATIONAL FOOTBALL LEAGUE *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 7806—**James B. Moran**, *Judge.*

———————

ARGUED JUNE 3, 2008—DECIDED AUGUST 18, 2008

———————

Before KANNE, SYKES, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* American Needle Inc. sued the National Football League (NFL), its member football teams, and NFL Properties LLC (to whom we will collectively refer as "the NFL defendants"), along with Reebok International Ltd. ("Reebok"), alleging that the teams' exclusive licensing agreement with Reebok violated the Sherman Antitrust Act. *See* 15 U.S.C. §§ 1-2. The district court granted summary judgment to the NFL defendants. We affirm.

## I. HISTORY

As the most successful and popular professional sports league in America today, the NFL needs little introduction. Indeed, the NFL has inspired countless hours of heated and in-depth discussion about the league's 88 years of professional-football history, including its great players, championship teams, and memorable games. But the only discussion the NFL inspires here involves aspects of the league that are not as well known: the league's corporate structure, and the nature of its relationships with its member teams and the entities charged with licensing those teams' intellectual property.

For those who do not know, the NFL is an unincorporated association of (now) 32 separately owned and operated football teams that collectively produce an annual series (or "season") of over 250 interrelated football games. Each season culminates in a championship game—a game better known as the Super Bowl. As such, the product that the teams produce jointly—NFL football—requires extensive coordination and integration between the teams. After all, NFL football is produced only when two teams play a football game. Thus, although each team is a separate corporate entity or partnership unto itself, no team can produce a game—the product of NFL football—by itself, much less a full season of games or the Super Bowl. Likewise, the teams' individual success is necessarily linked to the success of the league as a whole; to put it another way, it makes little difference if a team wins the Super Bowl if no one cares about the Super Bowl.

Realizing that the success of the NFL as a whole was in their best interests, in the early 1960's the individual

teams sought to collectively promote the NFL Brand—that is, the intellectual property of the NFL and its member teams—to compete against other forms of entertainment. With this promotional effort in mind, in 1963 the NFL teams formed NFL Properties: a separate corporate entity charged with (1) developing, licensing, and marketing the intellectual property the teams owned, such as their logos, trademarks, and other indicia; and (2) "conduct[ing] and engag[ing] in advertising campaigns and promotional ventures on behalf of the NFL and [its] member [teams]." Among other things, the NFL teams authorized NFL Properties to grant licenses to vendors so the vendors could use the teams' intellectual property to manufacture and sell various kinds of consumer products that bear the teams' logos and trademarks—products such as team jerseys, shirts, flags, and, as pertinent here, headwear, like baseball caps and stocking hats.

For a while after its establishment, NFL Properties granted headwear licenses to a number of different vendors simultaneously; one of those vendors was American Needle, which held an NFL headwear license for over 20 years. But then in 2000, the NFL teams authorized NFL Properties to solicit bids from the vendors for an exclusive headwear license. Reebok won the bidding war, and in 2001 the NFL teams allowed NFL Properties to grant an exclusive license to Reebok for ten years. NFL Properties thus did not renew American Needle's headwear license, or the licenses of the other headwear vendors.

American Needle responded to the loss of its headwear license by filing an antitrust action against the NFL, NFL

Properties, the individual NFL teams, and Reebok. As relevant here, American Needle claimed that the exclusive headwear licensing agreement between NFL Properties and Reebok violated § 1 of the Sherman Antitrust Act, which outlaws any "contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1. As American Needle saw it, because each of the individual teams separately owned their team logos and trademarks, their collective agreement to authorize NFL Properties to award the exclusive headwear license to Reebok was, in fact, a conspiracy to restrict other vendors' ability to obtain licenses for the teams' intellectual property. American Needle also contended that, by authorizing NFL Properties to award the license to Reebok, the NFL teams monopolized the NFL team licensing and product wholesale markets in violation of § 2 of the Sherman Antitrust Act. *See id.* § 2.

One year after American Needle brought its suit, the NFL defendants filed a motion for summary judgment on the company's § 1 claim. The NFL defendants argued that, under the United States Supreme Court's decision in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), and its progeny, they were immune from liability under § 1. In *Copperweld*, the Supreme Court concluded that a parent corporation and its wholly owned subsidiary are a single entity for antitrust purposes. *Id.* at 771. The Court based its conclusion on its determination that the parent-subsidiary relationship did not yield the anti-competitive risks that the Sherman Antitrust Act was enacted to combat. *Id.* at 769, 771. Specifically, the Court stated that agreements between companies are

generally subject to § 1 review because they deprive the market of the independent sources of economic power that competition requires. *Id.* at 769. But because the parent-subsidiary relationship is always "guided or determined not by two separate corporate consciousnesses, but one," the relationship does not deprive the market of any independent sources of economic power. *Id.* at 771.

Federal courts in later cases extended the single-entity concept beyond the context of a parent-subsidiary relationship, stating that affiliated companies or individuals could also be considered a single entity in certain circumstances. *See, e.g.*, *Jack Russell Terrier Network v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005); *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 205 (5th Cir. 2000); *Chi. Prof'l Sports Ltd. v. Nat'l Basketball Ass'n* ("*Bulls II*"), 95 F.3d 593, 597-600 (7th Cir. 1996); *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 271, 276-77 (8th Cir. 1988). Relying on this gradual extension of *Copperweld*, the NFL defendants asserted that they functioned as a single entity when collectively promoting NFL football by licensing the NFL teams' intellectual property, and were thus immune from liability under § 1.

American Needle did not immediately oppose the NFL defendants' summary-judgment motion. Instead, the company moved for a continuance under Fed. R. Civ. P. 56(f) on the ground that it was "unable to present admissible evidence" to dispute the NFL defendants' single-entity defense. That evidence, American Needle stated, "was in the possession of the defendants." The company therefore asked the district court for the opportunity to take dis-

covery regarding the NFL defendants' single-entity defense
and "a number of issues generally," and included a list
of 51 discovery requests.

The NFL defendants, in turn, objected to American
Needle's discovery requests on the ground that, as a
whole, they were not limited to the single-entity issue. The
NFL defendants, did, however, offer to produce a wide
range of documents they considered to be related to their
single-entity defense. The district court reserved judg-
ment on the NFL defendants' objection, and urged Ameri-
can Needle to narrow its discovery requests. In response,
American Needle made additional discovery requests
that were even more extensive in scope and number than
its original requests. The NFL defendants again objected,
and the district court ruled that, until the NFL defendants'
summary-judgment motion was resolved, discovery
would be limited to the single-entity issue. The court then
ordered the NFL defendants to produce all documents
pertinent to their single-entity defense.

Discovery ensued. The NFL defendants abided by the
district court's order and disclosed a voluminous amount
of documents related to their single-entity defense. But
when discovery concluded, American Needle filed a
second Rule 56(f) motion. As it had done earlier, American
Needle stated that it was "unable to present admissible
evidence" to dispute the NFL defendants' single-entity
defense because that evidence was "in the possession of
the defendants." American Needle then listed 49 discovery
requests it sought to have the NFL defendants complete;
most of those requests were copied verbatim from the

requests American Needle made earlier. The district court took American Needle's second Rule 56(f) motion under advisement, and ordered the company to respond to the merits of the NFL defendants' summary-judgment motion.

Shortly after briefing completed, the district court issued an order in which it both denied American Needle's Rule 56(f) motion, and granted the NFL defendants' motion for summary judgment on American Needle's § 1 claim. The district court determined that further discovery on the single-entity issue was unnecessary because "the facts that materially [bore] upon the [court's] decision[ ] [were] undisputed," and led "to the conclusion that the NFL and the teams act as a single entity in licensing their intellectual property." The court's conclusion was based on its determination that the NFL teams' collective-licensing agreement serves "to promote NFL football." And by promoting NFL football through collective licensing, the court continued, the NFL teams "act[ ] as an economic unit" in such a manner that "they should be deemed to be a single entity." The court therefore concluded that American Needle's § 1 claim failed as a matter of law because, under *Copperweld*, single entities cannot restrain trade in violation of the Sherman Antitrust Act. The court then sought supplemental briefing on whether its single-entity finding compelled the dismissal of American Needle's § 2 monopolization claim.

After the parties submitted their briefs addressing American Needle's § 2 monopolization claim, the court granted summary judgment to the NFL defendants. The court concluded that its earlier single-entity determina-

tion doomed American Needle's § 2 claim because, as a single entity, the NFL and its member teams could collectively license their intellectual property "to one or many without running afoul of the antitrust laws." This appeal followed.

## II. ANALYSIS

American Needle attacks the district court's judgment by forwarding two arguments. First, American Needle contends that the district court incorrectly denied its Rule 56(f) motion before granting summary judgment to the NFL defendants on its § 1 claim. American Needle further asserts that the district court was wrong to grant the NFL defendants' motions for summary judgment on both its § 1 and § 2 monopolization claims. We address these arguments in turn.

### A. *The district court's denial of American Needle's Rule 56(f) motion*

We first address the district court's denial of American Needle's Rule 56(f) motion, a decision that we review for abuse of discretion. *See Hammer v. Ashcroft*, 512 F.3d 961, 971 (7th Cir. 2008). According to American Needle, the district court abused its discretion by allowing it, without explanation, "to obtain only those documents that the [NFL] defendants themselves agreed to provide," and not the documents that the company sought in its discovery requests. In American Needle's view, the district court

"cannot, without explanation, permit one party to control the flow of information" in discovery, and "[t]o do so is not the exercise, but the abdication, of discretion."

But the premise of American Needle's argument is flawed: the district court did not, as American Needle puts it, "abdicate" its discretion over discovery matters to the NFL defendants "without explanation." To the contrary, the district court's denial of American Needle's Rule 56(f) motion was thoroughly explained.

After American Needle submitted its second set of wide-ranging discovery requests, the district court ruled that discovery would be limited to only those documents pertaining to the NFL defendants' single-entity defense, and ordered the defendants to turn over all the documents related to their defense. And in its order rejecting American Needle's second Rule 56(f) motion, the court clearly explained that further discovery was unnecessary because "the facts that materially [bore] upon the [court's] decision[ ] [were] undisputed," and led "to the conclusion that the NFL and the teams act as a single entity in licensing their intellectual property."

In any event, American Needle fails to show that the district court was wrong to deny additional discovery. To succeed on its challenge, American Needle needs to identify the "specific evidence which [it] might have obtained from [the NFL defendants] that would create a genuine issue" as to the defendants' single-entity defense, and thus allow American Needle's § 1 claim to survive summary judgment. *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 885 (7th Cir. 2005); *see also United States v. All*

*Assets & Equip. of W. Side Bldg. Corp.*, 58 F.3d 1181, 1190-91 (7th Cir. 1995) (affirming district court's denial of defendants' request for additional discovery because request "lacked specificity concerning what information [the defendants] hoped to uncover and how it would refute [the claims brought against them]"). American Needle identifies no such evidence, however; instead, the company merely explains that further discovery was necessary because "the determination of the single entity question [sic] requires a fact intensive inquiry [sic]."

However, American Needle's point is irrelevant. Just because the resolution of the single-entity issue is "fact intensive" does not speak to whether additional discovery was necessary to uncover specific evidence; after all, the large number of documents American Needle obtained from the NFL defendants could have provided such a complete answer to the "fact-intensive" question as to render further discovery unnecessary. We thus cannot say that the district court abused its discretion by denying American Needle's Rule 56(f) motion. *See Davis*, 396 F.3d at 885; *All Assets & Equip.*, 58 F.3d at 1190-91.

  B.  *The district court's grant of summary judgment to the*
      *NFL defendants*

American Needle next challenges the district court's grant of summary judgment to the NFL defendants. We review the district court's grant of summary judgment *de novo*, taking the facts in the light most favorable to American Needle, the non-moving party. *See Foskett v.*

*Great Wolf Resorts, Inc.*, 518 F.3d 518, 522 (7th Cir. 2008). And in so viewing the record, we will examine whether there is a genuine issue of material fact that precludes judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Cady v. Sheahan*, 467 F.3d 1057, 1060-61 (7th Cir. 2006).

American Needle first contends that the district court erred by granting the NFL defendants' summary judgment on its § 1 claim. Specifically, American Needle argues that the district court incorrectly concluded that the NFL teams constitute a single entity under *Copperweld* when collectively licensing their intellectual property. American Needle's argument leads us into murky waters. We have yet to render a definitive opinion as to whether the teams of a professional sports league can be considered a single entity in light of *Copperweld*. The characteristics that sports leagues generally exhibit make the determination difficult; in some contexts, a league seems more aptly described as a single entity immune from antitrust scrutiny, while in others a league appears to be a joint venture between independently owned teams that is subject to review under § 1. *See Brown v. Pro-Football, Inc.*, 518 U.S. 231, 248-49 (1996) ("[T]he clubs that make up a professional sports league are not completely independent economic competitors . . . .  In the present context, however, that circumstance makes the league more like a single bargaining employer . . . ."); *Bulls II*, 95 F.3d at 597-99 ("To say that the league is 'more like a single bargaining employer' than a multi-employer unit is not to say that it necessarily is one, for every purpose."); *see also Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733,

741 (6th Cir. 1999) ("[T]he notion of concerted action liability in the field of professional sports is at best confusing."). For instance, from the perspective of fans, a professional sports league can be seen as "a single source" of entertainment that produces "one product," even though the league's member teams are distinguishable. *Bulls II*, 95 F.3d at 599. Yet at the same time, individuals seeking employment with any of the league's teams would view the league as a collection of loosely affiliated companies that all have the independent authority to hire and fire employees. *See Brown*, 518 U.S. at 249 (noting that professional football players "often negotiate their pay individually with their employers," NFL teams); *Bulls II*, 95 F.3d at 599 ("[F]rom the perspective of college basketball players who seek to sell their skills, the teams [in the National Basketball League (NBA)] are distinct . . . .").

That being said, we have nevertheless embraced the possibility that a professional sports league *could* be considered a single entity under *Copperweld*. *Bulls II*, 95 F.3d at 598. *But see Fraser v. Major League Soccer*, *L.L.C.*, 284 F.3d 47, 55-56 (1st Cir. 2002) (citing *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1099 (1st Cir. 1994), to note that *Bulls II* has not yet been adopted by United States Court of Appeals for the First Circuit). But because of the many and conflicting characteristics that professional sports leagues generally exhibit, we have expressed skepticism that *Copperweld* could provide the definitive single-entity determination for all sports leagues alike. *See id.* at 599-600. This skepticism, in turn, has led us to opine that the question of whether a professional sports league is a single entity should be addressed not only "one league

at a time," but also "one facet of a league at a time." *Id.* at 600. Thus, in reviewing the district court's decision, we will limit our review to (1) the actions of the NFL, its members teams, and NFL Properties; and (2) the actions of the NFL and its member teams as they pertain to the teams' agreement to license their intellectual property collectively via NFL Properties.

With this compartmentalization of *Copperweld* in mind, we turn to American Needle's challenge to the district court's single-entity determination. According to American Needle, the district court applied the wrong legal standard when concluding that the NFL teams were a single entity. As American Needle sees it, the district court concluded "that the NFL [t]eams are a single entity because they 'act' as a single entity in licensing their intellectual property." American Needle asserts that this approach undercuts the Supreme Court's central teaching in *Copperweld*: that the Sherman Antitrust Act was designed to combat the deprivation of independent sources of economic power in the marketplace. *See* 467 U.S. at 469-71.

Therefore, American Needle continues, instead of asking whether the NFL teams merely "'act'" as a single entity, the district court should have inquired into whether the NFL teams' agreement to license their intellectual property collectively deprived the market of sources of economic power that control the intellectual property. That question, the company contends, can be answered by looking to whether the teams could compete against one another when licensing and marketing their intellectual property.

If so, American Needle posits, then it is the individual teams who actually control their intellectual property, meaning that they cannot be considered a single entity for the purposes of licensing their intellectual property.

We agree with American Needle that the Supreme Court in *Copperweld* was concerned about the anti-competitive effects that collective action might introduce into the market. *See id.*; *Bulls II*, 95 F.3d at 598; *see also Spectrum Sports v. McQuillan*, 506 U.S. 447, 458-59 (1993) (discussing *Copperweld* in context of § 2 claim); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000) (same). We further agree that when making a single-entity determination, courts must examine whether the conduct in question deprives the marketplace of the independent sources of economic control that competition assumes. *See Copperweld*, 467 U.S. at 469-71; *Bulls II*, 95 F.3d at 598; *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1337 (7th Cir. 1986).

But we are not convinced that the NFL's single-entity status in the present context turns entirely on whether the league's member teams can compete with one another when licensing and marketing their intellectual property. American Needle's proposed approach is one step removed from saying that the NFL teams can be a single entity only if the teams have "a complete unity of interest"—a legal proposition that we have rejected as "silly." *Bulls II*, 95 F.3d at 598. As we have explained, *"Copperweld* does not hold that only conflict-free enterprises may be treated as single entities"; "[e]ven a single firm contains many competing interests." *Id.* at 598 (dis-

cussing Robert G. Eccles, *Transfer Pricing as a Problem of Agency, in Principals and Agents: The Structure of Business* 151 (1985)). Thus, though the several NFL teams could have competing interests regarding the use of their intellectual property that could conceivably rise to the level of potential intra-league competition, those interests do not necessarily keep the teams from functioning as a single entity. *Id.* at 597-98. We therefore cannot fault the district court for not considering whether the NFL teams could compete against one another when licensing and marketing their intellectual property.

And with that said, American Needle's assertion that the NFL teams have deprived the market of independent sources of economic power unravels. Certainly the NFL teams can function only as one source of economic power when collectively producing NFL football. Asserting that a single football team could produce a football game is less of a legal argument then it is a Zen riddle: Who wins when a football team plays itself? *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 101 (1984) ("'[Some] activities can only be carried out jointly. Perhaps the leading example is league sports. When a league of professional lacrosse teams is formed, it would be pointless to declare their cooperation illegal on the ground that there are no other professional lacrosse teams.'" (quoting Robert Bork, *The Antitrust Paradox* 278 (1978))); *Bulls II*, 95 F.3d at 599 ("[T]he NBA has no existence independent of sports. It makes professional basketball; only it can make 'NBA Basketball' games . . . ."). It thus follows that only one source of economic power controls the promotion of

NFL football; it makes little sense to assert that each individual team has the authority, if not the responsibility, to promote the jointly produced NFL football. Indeed, the NFL defendants introduced uncontradicted evidence that the NFL teams share a vital economic interest in collectively promoting NFL football. After all, the league competes with other forms of entertainment for an audience of finite (if extremely large) size, and the loss of audience members to alternative forms of entertainment necessarily impacts the individual teams' success. *See Bulls II*, 95 F.3d at 597; *see also Brown*, 518 U.S. at 248 ("[T]he [teams] that make up a professional sports league are not completely independent economic competitors, as they depend upon a degree of cooperation for economic survival."); *Nat'l Football League v. N. Am. Soccer League*, 459 U.S. 1074, 1077 (1982) (Rehnquist, J., dissenting) ("The NFL . . . competes with other sports and other forms of entertainment in the entertainment market. Although individual NFL teams compete with one another on the playing field, they rarely compete in the market place.").

But most importantly, the record amply establishes that since 1963, the NFL teams have acted as one source of economic power—under the auspices of NFL Properties—to license their intellectual property collectively and to promote NFL football. Tellingly, American Needle does not dispute that the NFL teams collectively license their intellectual property to promote NFL football; in fact, when opposing the NFL defendants' motion for summary judgment, American Needle relied on NFL Properties's Articles of Incorporation, which state that the teams formed NFL Properties "[t]o conduct and engage

in advertising campaigns and promotional ventures on behalf of the [NFL] and the member [teams]." And our review of the record reveals no evidence that requires us to question the purpose of the teams' licensing agreement.

Simply put, nothing in § 1 prohibits the NFL teams from cooperating so the league can compete against other entertainment providers. Indeed, antitrust law encourages cooperation inside a business organization—such as, in this case, a professional sports league—to foster competition between that organization and its competitors. *See Bulls II*, 95 F.3d at 599. Viewed in this light, the NFL teams are best described as a single source of economic power when promoting NFL football through licensing the teams' intellectual property, and we thus cannot say that the district court was wrong to so conclude.

Moving on, the failure of American Needle's § 1 claim necessarily dooms its § 2 monopolization claim. As a single entity for the purpose of licensing, the NFL teams are free under § 2 to license their intellectual property on an exclusive basis, *see Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 740 (7th Cir. 2003), even if the teams opt to reduce the number of companies to whom they grant licenses, *see Bulls II*, 95 F.3d at 598 ("To say that participants in an organization may cooperate is to say that they may control what they make and how they sell it: the producers of Star Trek may decide to release two episodes a week and grant exclusive licenses to show them, even though this reduces the number of times episodes appear on TV in a given market . . . ."); Gregory J. Werden, *Antitrust Analysis*

*of Joint Ventures: An Overview*, 66 Antitrust L.J. 701, 730-31 (1998) ("An antitrust claim based solely on a single firm's denial of a license to a trademark would readily be dismissed . . . ."). As such, American Needle has no colorable claim that the NFL teams and NFL Properties created a monopoly by awarding Reebok the exclusive headwear licensing contract. *See Cook Inc.*, 333 F.3d at 740 (discussing competitive effects of exclusive-licensing agreements); *Bulls II*, 95 F.3d at 598. The district court was therefore correct to grant summary judgment to the NFL defendants on American Needle's § 2 monopolization claim.

### III. CONCLUSION

We AFFIRM the district court's judgment.