[560 U.S. 183]

AMERICAN NEEDLE, INC., Petitioner

v

NATIONAL FOOTBALL LEAGUE et al.

560 U.S. 183, 130 S. Ct. 2201, 176 L. Ed. 2d 947, 2010 U.S. LEXIS 4166

[No. 08-661]

Argued January 13, 2010.  Decided May 24, 2010.

951

**APPEARANCES OF COUNSEL ARGUING CASE**

**Glen D. Nager** argued the cause for petitioner.

**Malcolm L. Stewart** argued the cause for the United States, as amicus curiae, by special leave of court.

**Gregg H. Levy** argued the cause for respondents.

Stevens, J., delivered the opinion for a unanimous Court.

[560 U.S. 186]

Justice **Stevens** delivered the opinion of the Court.

■ "Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade" is made illegal by § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U.S.C. § 1. The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade. This case raises that antecedent question about the business of the 32 teams in the National Football League (NFL) and a corporate entity that they formed to manage their intellectual property. We conclude that the NFL's licensing activities constitute concerted action that is not categorically beyond the coverage of § 1. The legality of that concerted action must be judged under the Rule of Reason.

[560 U.S. 187]

I

Originally organized in 1920, the NFL is an unincorporated association that now includes 32 separately owned professional football teams.[1] Each team has its own name, colors, and logo, and owns related intellectual property. Like each of the other teams in the league, the New Orleans Saints and the Indianapolis Colts, for example, have their own distinctive names, colors, and marks that are well known to millions of sports fans.

Prior to 1963, the teams made their own arrangements for licensing their intellectual property and marketing trademarked items such as caps and

jerseys. In 1963, the teams formed National Football League Properties (NFLP) to develop, license, and market their intellectual property. Most, but not all, of the substantial revenues generated by NFLP have either been given to charity or shared equally among the teams. However, the teams are able to and have at times sought to withdraw from this arrangement.

Between 1963 and 2000, NFLP granted nonexclusive licenses to a number of vendors, permitting them to manufacture and sell apparel bearing team insignias. Petitioner, American Needle, Inc., was one of those licensees. In December 2000, the teams voted to authorize NFLP to grant exclusive licenses, and NFLP granted Reebok International Ltd. an exclusive 10-year license to manufacture and sell trademarked headwear for all 32 teams. It thereafter declined to renew American Needle's nonexclusive license.

American Needle filed this action in the Northern District of Illinois, alleging that the agreements between the NFL, its teams, NFLP, and Reebok violated §§ 1 and 2 of the Sherman Act. In their answer to the complaint, the defendants

[560 U.S. 188]

averred that the teams, the NFL, and NFLP were incapable of conspiring within the meaning of § 1 "because they are a single economic enterprise, at least with respect to the conduct challenged." App. 99. After limited discovery, the District Court granted summary judgment on the question "whether, with regard to the facet of their operations

---

1. The NFL was founded in Canton, Ohio, as the "American Professional Football Association." *United States Football League v. National Football League*, 842 F.2d 1335, 1343 (CA2 1988). It took its current name in 1922. *Ibid.* Forty-one franchises failed in the first 41 years of the league's existence. *Ibid.*

respecting exploitation of intellectual property rights, the NFL and its 32 teams are, in the jargon of antitrust law, acting as a single entity." *American Needle, Inc.* v. *New Orleans La. Saints*, 496 F. Supp. 2d 941, 943 (2007). The court concluded "that in that facet of their operations they have so integrated their operations that they should be deemed a single entity rather than joint ventures cooperating for a common purpose." *Ibid.*

The Court of Appeals for the Seventh Circuit affirmed. The panel observed that "in some contexts, a league seems more aptly described as a single entity immune from antitrust scrutiny, while in others a league appears to be a joint venture between independently owned teams that is subject to review under § 1." 538 F.3d 736, 741 (2008). Relying on Circuit precedent, the court limited its inquiry to the particular conduct at issue, licensing of teams' intellectual property. The panel agreed with petitioner that "when making a single-entity determination, courts must examine whether the conduct in question deprives the marketplace of the independent sources of economic control that competition assumes." *Id.*, at 742. The court, however, discounted the significance of potential competition among the teams regarding the use of their intellectual property because the teams "can function only as one source of economic power when collectively producing NFL football." *Id.*, at 743. The court noted that football itself can only be carried out jointly. See *ibid.* ("Asserting that a single football team could produce a football game . . . is a Zen riddle: Who wins when a football team plays itself "). Moreover, "NFL teams share a vital economic interest in collectively promoting

[560 U.S. 189]
NFL football . . . [to] compet[e] with other forms of entertainment." *Ibid.* "It thus follows," the court found, "that only one source of economic power controls the promotion of NFL football," and "it makes little sense to assert that each individual team has the authority, if not the responsibility, to promote the jointly produced NFL football." *Ibid.* Recognizing that NFL teams have "license[d] their intellectual property collectively" since 1963, the court held that § 1 did not apply. *Id.*, at 744.

We granted certiorari. 557 U.S. 933, 129 S. Ct. 2859, 174 L. Ed. 2d 575 (2009).

## II

As the case comes to us, we have only a narrow issue to decide: whether the NFL respondents are capable of engaging in a "contract, combination . . . , or conspiracy" as defined by § 1 of the Sherman Act, 15 U.S.C. § 1, or, as we have sometimes phrased it, whether the alleged activity by the NFL respondents "must be viewed as that of a single enterprise for purposes of § 1." *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U.S. 752, 771, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984) (1984).

Taken literally, the applicability of § 1 to "every contract, combination . . . , or conspiracy" could be understood to cover every conceivable agreement, whether it be a group of competing firms fixing prices or a single firm's chief executive telling her subordinate how to price their company's product. But ■ even though, "read literally," § 1 would address "the entire body of private contract," that is not what the statute means. *National Soc. of Professional Engineers* v. *United States*, 435 U.S. 679, 688, 98 S.

Ct. 1355, 55 L. Ed. 2d 637 (1978); see also *Texaco Inc.* v. *Dagher*, 547 U.S. 1, 5, 126 S. Ct. 1276, 164 L. Ed. 2d 1 (2006) ("This Court has not taken a literal approach to this language"); cf. *Board of Trade of Chicago* v. *United States*, 246 U.S. 231, 238, 38 S. Ct. 242, 62 L. Ed. 683 (1918) (reasoning that the term "restraint of trade" in § 1 cannot possibly refer to any restraint on competition because "[e]very agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence"). Not every instance

[560 U.S. 190]

of cooperation between two people is a potential "contract, combination . . . , or conspiracy, in restraint of trade." 15 U.S.C. § 1.

■ The meaning of the term "contract, combination . . . , or conspiracy" is informed by the " 'basic distinction' " in the Sherman Act " 'between concerted and independent action' " that distinguishes § 1 of the Sherman Act from § 2. *Copperweld*, 467 U.S., at 767, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (quoting *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U.S. 752, 761, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)). Section 1 applies only to concerted action that restrains trade. Section 2, by contrast, covers both concerted and independent action, but only if that action "monopolize[s]," 15 U.S.C. § 2, or "threatens actual monopolization," *Copperweld*, 467 U.S., at 767, 104 S. Ct. 2731, 81 L. Ed.

2d 628, a category that is narrower than restraint of trade. Monopoly power may be equally harmful whether it is the product of joint action or individual action.

Congress used this distinction between concerted and independent action to deter anticompetitive conduct and compensate its victims, without chilling vigorous competition through ordinary business operations. The distinction also avoids judicial scrutiny of routine, internal business decisions.

Thus, ■ in § 1 Congress "treated concerted behavior more strictly than unilateral behavior." *Id.*, at 768, 104 S. Ct. 2731, 81 L. Ed. 2d 628. This is so because unlike independent action, "[c]oncerted activity inherently is fraught with anticompetitive risk" insofar as it "deprives the marketplace of independent centers of decision-making that competition assumes and demands." *Id.*, at 768–769, 104 S. Ct. 2731, 81 L. Ed. 2d 628. And because concerted action is discrete and distinct, a limit on such activity leaves untouched a vast amount of business conduct. As a result, there is less risk of deterring a firm's necessary conduct; courts need only examine discrete agreements; and such conduct may be remedied simply through prohibition.[2] See Areeda & Hovenkamp

[560 U.S. 191]

¶1464c, at 206. Concerted activity is thus "judged more sternly than unilateral activity under

---

**2.** If Congress prohibited independent action that merely restrains trade (even if it does not threaten monopolization), that prohibition could deter perfectly competitive conduct by firms that are fearful of litigation costs and judicial error. See *Copperweld*, 467 U.S., at 768, 104 S. Ct. 2731, 81 L. Ed. 2d 628 ("Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur"); cf. *United States* v. *United States Gypsum Co.*, 438 U.S. 422, 441, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978) ("[S]alutary and procompetitive conduct . . . might be shunned by businessmen who chose to be excessively cautious in the face of uncertainty"). Moreover, if every unilateral action that restrained trade were subject to antitrust scrutiny, then courts would be forced to judge almost every internal business decision. See 7 P. Areeda & H. Hovenkamp, Antitrust Law ¶1464c, p. 206 (2d ed. 2003) (hereinafter Areeda & Hovenkamp) (unilateral behavior is "often difficult to evaluate or remedy").

§ 2," *Copperweld*, 467 U.S., at 768, 104 S. Ct. 2731, 81 L. Ed. 2d 628. For these reasons, § 1 prohibits any concerted action "in restraint of trade or commerce," even if the action does not "threate[n] monopolization," *ibid.* And therefore, an arrangement must embody concerted action in order to be a "contract, combination . . . , or conspiracy" under § 1.

### III

We have long held that ▇ concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities. Instead, we have eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate.

As a result, we have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity. In *United States* v. *Sealy, Inc.*, 388 U.S. 350, 87 S. Ct. 1847, 18 L. Ed. 2d 1238 (1967), for example, a group of mattress manufacturers operated and controlled Sealy, Inc., a company that licensed the Sealy trademark to the manufacturers, and dictated that each operate within a specific geographic area. *Id.*, at 352–353, 87 S. Ct. 1847, 18 L. Ed. 2d 1238. The Government alleged that the licensees and Sealy were conspiring in violation of § 1, and we agreed. *Id.*, at 352–354, 87 S. Ct.

1847, 18 L. Ed. 2d 1238. We explained that "[w]e seek the central substance of the situation" and

**[560 U.S. 192]**

therefore "we are moved by the identity of the persons who act, rather than the label of their hats." *Id.*, at 353, 87 S. Ct. 1847, 18 L. Ed. 2d 1238. We thus held that Sealy was not a "separate entity, but . . . an instrumentality of the individual manufacturers." *Id.*, at 356, 87 S. Ct. 1847, 18 L. Ed. 2d 1238. In similar circumstances, we have found other formally distinct business organizations covered by § 1. See, *e.g.*, *Northwest Wholesale Stationers, Inc.* v. *Pacific Stationery & Printing Co.*, 472 U.S. 284, 105 S. Ct. 2613, 86 L. Ed. 2d 202 (1985); *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984) *(NCAA)*; *United States* v. *Topco Associates, Inc.*, 405 U.S. 596, 609, 92 S. Ct. 1126, 31 L. Ed. 2d 515 (1972); *Associated Press* v. *United States*, 326 U.S. 1, 65 S. Ct. 1416, 89 L. Ed. 2013 (1945); *id.*, at 26, 65 S. Ct. 1416, 89 L. Ed. 2013 (Frankfurter, J., concurring); *United States* v. *Terminal Railroad Assn. of St. Louis*, 224 U.S. 383, 32 S. Ct. 507, 56 L. Ed. 810 (1912); see also Rock, Corporate Law Through an Antitrust Lens, 92 Colum. L. Rev. 497, 506–510 (1992) (discussing cases). We have similarly looked past the form of a legally "single entity" when competitors were part of professional organization[3] or trade groups.[4]

---

**3.** See, *e.g.*, *FTC* v. *Indiana Federation of Dentists*, 476 U.S. 447, 106 S. Ct. 2009, 90 L. Ed. 2d 445 (1986); *Arizona* v. *Maricopa County Medical Soc.*, 457 U.S. 332, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1982); *National Soc. of Professional Engineers* v. *United States*, 435 U.S. 679, 98 S. Ct. 1355, 55 L. Ed. 2d 637 (1978); *Goldfarb* v. *Virginia State Bar*, 421 U.S. 773, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975).

**4.** See, *e.g.*, *Allied Tube & Conduit Corp.* v. *Indian Head, Inc.*, 486 U.S. 492, 108 S. Ct. 1931, 100 L. Ed. 2d 497 (1988); *Radiant Burners, Inc.* v. *Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S. Ct. 365, 5 L. Ed. 2d 358 (1961) *(per curiam)*; *Fashion Originators' Guild of America, Inc.* v. *FTC*, 312 U.S. 457, 61 S. Ct. 703, 85 L. Ed. 949 (1941).

Conversely, ▪ there is not necessarily concerted action simply because more than one legally distinct entity is involved. Although, under a now-defunct doctrine known as the "intraenterprise conspiracy doctrine," we once treated cooperation between legally separate entities as necessarily covered by § 1, we now embark on a more functional analysis.

The roots of this functional analysis can be found in the very decision that established the intraenterprise conspiracy doctrine. In *United States* v. *Yellow Cab Co.*, 332 U.S. 218, 67 S. Ct. 1560, 91 L. Ed. 2010 (1947), we observed that "corporate interrelationships . . .

[560 U.S. 193]

are not determinative of the applicability of the Sherman Act" because the Act "is aimed at substance rather than form." *Id.*, at 227, 67 S. Ct. 1560, 91 L. Ed. 2010. We nonetheless held that cooperation between legally separate entities was necessarily covered by § 1 because an unreasonable restraint of trade "may result as readily from a conspiracy among those who are affiliated or integrated under common ownership as from a conspiracy among those who are otherwise independent." *Ibid.;* see also *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S. Ct. 259, 95 L. Ed. 219 (1951).

The decline of the intraenterprise conspiracy doctrine began in *Sunkist Growers, Inc.* v. *Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 82 S. Ct. 1130, 8 L. Ed. 2d 305 (1962). In that case, several agricultural cooperatives that were owned by the same farmers were sued for violations of § 1 of the Sherman Act. *Id.*, at 24–25, 82 S. Ct. 1130, 8 L. Ed. 2d 305. Applying a specific immunity provision for agricultural cooperatives, we held that the three cooperatives were "in prac-tical effect" one "organization," even though the controlling farmers "have formally organized themselves into three separate legal entities." *Id.*, at 29, 82 S. Ct. 1130, 8 L. Ed. 2d 305. "To hold otherwise," we explained, "would be to impose grave legal consequences upon organizational distinctions that are of *de minimis* meaning and effect" insofar as "use of separate corporations had [no] economic significance." *Ibid.*

Next, in *United States* v. *Citizens & Southern Nat. Bank*, 422 U.S. 86, 95 S. Ct. 2099, 45 L. Ed. 2d 41 (1975), a large bank, Citizens and Southern (C&S), formed a holding company that operated *de facto* suburban branch banks in the Atlanta area through ownership of the maximum amount of stock in each local branch that was allowed by law, "ownership of much of the remaining stock by parties friendly to C, use by the suburban banks of the C logogram and all of C's banking services, and close C oversight of the operation and governance of the suburban banks." *Id.*, at 89, 95 S. Ct. 2099, 45 L. Ed. 2d 41 (footnote omitted). The Government challenged the cooperation between the banks. In our analysis, we observed that " 'corporate interrelationships

[560 U.S. 194]

. . . are not determinative,' " *id.*, at 116, 95 S. Ct. 2099, 45 L. Ed. 2d 41, "looked to economic substance," and observed that "because the sponsored banks were not set up to be competitors, § 1 did not compel them to compete." Areeda & Hovenkamp ¶1463g, at 200–201; see also *Citizens & Southern*, 422 U.S., at 119–120, 95 S. Ct. 2099, 45 L. Ed. 2d 41; Areeda, Intraenterprise Conspiracy in Decline, 97 Harv. L. Rev. 451, 461 (1983).

We finally reexamined the intraenterprise conspiracy doctrine in *Copperweld Corp.* v. *Independence Tube*

959

*Corp.*, 467 U.S. 752, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984), and concluded that it was inconsistent with the " 'basic distinction between concerted and independent action.' " *Id.*, at 767, 104 S. Ct. 2731, 81 L. Ed. 2d 628. Considering it "perfectly plain that ■ an internal agreement to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police," *id.*, at 769, 104 S. Ct. 2731, 81 L. Ed. 2d 628, we held that a parent corporation and its wholly owned subsidiary "are incapable of conspiring with each other for purposes of § 1 of the Sherman Act," *id.*, at 777, 104 S. Ct. 2731, 81 L. Ed. 2d 628. We explained that although a parent corporation and its wholly owned subsidiary are "separate" for the purposes of incorporation or formal title, they are controlled by a single center of decisionmaking and they control a single aggregation of economic power. Joint conduct by two such entities does not "depriv[e] the marketplace of independent centers of decisionmaking," *id.*, at 769, 104 S. Ct. 2731, 81 L. Ed. 2d 628, and as a result, an agreement between them does not constitute a "contract, combination . . . , or conspiracy" for the purposes of § 1.[5]

[560 U.S. 195]

IV

As *Copperweld* exemplifies, ■ "substance, not form, should determine whether a[n] . . . entity is capable of conspiring under § 1." 467 U.S., at 773, n. 21, 104 S. Ct. 2731, 81 L. Ed. 2d 628. This inquiry is some-

times described as asking whether the alleged conspirators are a single entity. That is perhaps a misdescription, however, because the question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved "seem" like one firm or multiple firms in any metaphysical sense. The key is whether the alleged "contract, combination . . . , or conspiracy" is concerted action—that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a "contract, combination . . . , or conspiracy" amongst "separate economic actors pursuing separate economic interests," *id.*, at 769, 104 S. Ct. 2731, 81 L. Ed. 2d 628, such that the agreement "deprives the marketplace of independent centers of decisionmaking," *ibid.*, and therefore of "diversity of entrepreneurial interests," *Fraser* v. *Major League Soccer, L. L. C.*, 284 F.3d 47, 57 (CA1 2002) (Boudin, C. J.), and thus of actual or potential competition, see *Freeman* v. *San Diego Assn. of Realtors*, 322 F.3d 1133, 1148–1149 (CA9 2003) (Kozinski, J.); *Rothery Storage & Van Co.* v. *Atlas Van Line, Inc.*, 792 F.2d 210, 214–215 (CADC 1986) (Bork, J.); see also Areeda & Hovenkamp ¶1462b, at 193–194 (noting that the "central evil addressed by Sherman Act § 1" is the "elimin[ation] of] competition that would otherwise exist").

Thus, ■ while the president and a vice president of a firm could (and regularly do) act in combination, their joint action generally is not the sort of "combination" that § 1 is intended to

---

**5.** This focus on "substance, not form," *Copperweld*, 467 U.S., at 773, n. 21, 104 S. Ct. 2731, 81 L. Ed. 2d 628, can also be seen in our cases about whether a company and its agent are capable of conspiring under § 1. See, *e.g.*, *Simpson* v. *Union Oil Co. of Cal.*, 377 U.S. 13, 20–21, 84 S. Ct. 1051, 12 L. Ed. 2d 98 (1964); see also E. Elhauge & D. Geradin, Global Antitrust Law and Economics 787–788, and n. 7 (2007) (hereinafter Elhauge & Geradin) (explaining the functional difference between *Simpson* and *United States* v. *General Elec. Co.*, 272 U.S. 476, 47 S. Ct. 192, 71 L. Ed. 362 (1926), in which we treated a similar agreement as beyond the reach of § 1).

cover. Such agreements might be described as "really unilateral behavior flowing from decisions of a single enterprise." *Copperweld*, 467 U.S., at 767, 104 S. Ct. 2731, 81 L. Ed. 2d 628. Nor, for this reason, does § 1 cover "internally coordinated conduct of a corporation and one of its unincorporated divisions," *id.*, at 770, 104 S. Ct. 2731, 81 L. Ed. 2d 628, because

[560 U.S. 196]

"[a] division within a corporate structure pursues the common interests of the whole," *ibid.*, and therefore "coordination between a corporation and its division does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests," *id.*, at 770–771, 104 S. Ct. 2731, 81 L. Ed. 2d 628. Nor, for the same reasons, is "the coordinated activity of a parent and its wholly owned subsidiary" covered. See *id.*, at 771, 104 S. Ct. 2731, 81 L. Ed. 2d 628. They "have a complete unity of interest" and thus "[w]ith or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder." *Ibid.*

■■ Because the inquiry is one of competitive reality, it is not determinative that two parties to an alleged § 1 violation are legally distinct entities. Nor, however, is it determinative that two legally distinct entities have organized themselves under a single umbrella or into a structured joint venture. The question is whether the agreement joins together "independent centers of decisionmaking." *Id.*, at 769, 104 S. Ct. 2731, 81 L. Ed. 2d 628. If it does, the entities are capable of conspiring under § 1, and the court must decide whether the restraint of trade is an unreasonable and therefore illegal one.

## V

The NFL teams do not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action. Each of the teams is a substantial, independently owned, and independently managed business. "[T]heir general corporate actions are guided or determined" by "separate corporate consciousnesses," and "[t]heir objectives are" not "common." *Copperweld*, 467 U.S., at 771, 104 S. Ct. 2731, 81 L. Ed. 2d 628; see also *North American Soccer League* v. *NFL*, 670 F.2d 1249, 1252 (CA2 1982) (discussing ways that "the financial performance of each team, while related to that of the others, does not . . . necessarily rise and fall with that of the others"). The teams compete with one another, not only on the playing field, but to attract fans, for

[560 U.S. 197]

gate receipts, and for contracts with managerial and playing personnel. See *Brown* v. *Pro Football, Inc.*, 518 U.S. 231, 249, 116 S. Ct. 2116, 135 L. Ed. 2d 521 (1996); *Sullivan* v. *NFL*, 34 F.3d 1091, 1098 (CA1 1994); *Mid-South Grizzlies* v. *NFL*, 720 F.2d 772, 787 (CA3 1983); cf. *NCAA*, 468 U.S., at 99, 104 S. Ct. 2948, 82 L. Ed. 2d 70.

Directly relevant to this case, the teams compete in the market for intellectual property. To a firm making hats, the Saints and the Colts are two potentially competing suppliers of valuable trademarks. When each NFL team licenses its intellectual property, it is not pursuing the "common interests of the whole" league but is instead pursuing interests of each "corporation itself," *Copperweld*, 467 U.S., at 770, 104 S. Ct. 2731, 81 L. Ed. 2d 628; teams are acting as "separate economic actors pursuing separate economic interests," and each team therefore is a potential "independent cente[r] of decisionmaking," *id.*, at 769, 104 S. Ct. 2731, 81 L. Ed. 2d 628. Decisions by NFL teams to license

their separately owned trademarks collectively and to only one vendor are decisions that "depriv[e] the marketplace of independent centers of decisionmaking," *ibid.*, and therefore of actual or potential competition. See *NCAA*, 468 U.S., at 109, n. 39, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (observing a possible § 1 violation if two separately owned companies sold their separate products through a "single selling agent"); cf. Areeda & Hovenkamp ¶1478a, at 318 ("Obviously, the most significant competitive threats arise when joint venture participants are actual or potential competitors").

In defense, respondents argue that by forming NFLP, they have formed a single entity, akin to a merger, and market their NFL brands through a single outlet. But it is not dispositive that the teams have organized and own a legally separate entity that centralizes the management of their intellectual property. ■ An ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label. "Perhaps every agreement and combination in restraint of trade could be so labeled." *Timken Roller Bearing Co.* v. *United States*, 341 U.S. 593, 598, 71 S. Ct. 971, 95 L. Ed. 1199 (1951).

[560 U.S. 198]

The NFL respondents may be similar in some sense to a single enterprise that owns several pieces of intellectual property and licenses them jointly, but they are not similar in the relevant functional sense. Although NFL teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily aligned. See generally Hovenkamp, Exclusive Joint Ventures and Antitrust Policy, 1995 Colum. Bus. L. Rev. 1, 52–61 (1995);

Shishido, Conflicts of Interest and Fiduciary Duties in the Operation of a Joint Venture, 39 Hastings L. J. 63, 69–81 (1987). Common interests in the NFL brand "*partially* unit[e] the economic interests of the parent firms," Broadley, Joint Ventures and Antitrust Policy, 95 Harv. L. Rev. 1521, 1526 (1982) (emphasis added), but the teams still have distinct, potentially competing interests.

It may be, as respondents argue, that NFLP "has served as the 'single driver'" of the teams' "promotional vehicle, 'pursu[ing] the common interests of the whole.'" Brief for NFL Respondents 28 (quoting *Copperweld*, 467 U.S., at 770–771, 104 S. Ct. 2731, 81 L. Ed. 2d 628; brackets in original). But illegal restraints often are in the common interests of the parties to the restraint, at the expense of those who are not parties. It is true, as respondents describe, that they have for some time marketed their trademarks jointly. But ■ a history of concerted activity does not immunize conduct from § 1 scrutiny. "Absence of actual competition may simply be a manifestation of the anticompetitive agreement itself." *Freeman*, 322 F.3d, at 1149.

Respondents argue that nonetheless, as the Court of Appeals held, they constitute a single entity because without their cooperation, there would be no NFL football. It is true that "the clubs that make up a professional sports league are not completely independent economic competitors, as they depend upon a degree of cooperation for economic survival." *Brown*, 518 U.S., at 248, 116 S. Ct. 2116, 135 L. Ed. 2d 521. But the Court of Appeals' reasoning is unpersuasive.

[560 U.S. 199]

■ The justification for cooperation is not relevant to whether that coop-

eration is concerted or independent action.[6] A "contract, combination . . . , or conspiracy," § 1, that is necessary or useful to a joint venture is still a "contract, combination . . . , or conspiracy" if it "deprives the marketplace of independent centers of decisionmaking," *Copperweld*, 467 U.S., at 769, 104 S. Ct. 2731, 81 L. Ed. 2d 628. See *NCAA*, 468 U.S., at 113, 104 S. Ct. 2948, 82 L. Ed. 2d 70 ("[J]oint ventures have no immunity from antitrust laws"). Any joint venture involves multiple sources of economic power cooperating to produce a product. And for many such ventures, the participation of others is necessary. But that does not mean that necessity of cooperation transforms concerted action into independent action; a nut and a bolt can only operate together, but an agreement between nut and bolt manufacturers is still subject to § 1 analysis. Nor does it mean that once a group of firms agree to produce a joint product, cooperation amongst those firms must be treated as independent conduct. The mere fact that the teams operate jointly in some sense does not mean that they are immune.[7]

[560 U.S. 200]

The question whether NFLP decisions can constitute concerted activity covered by § 1 is closer than whether decisions made directly by the 32 teams are covered by § 1. This is so both because NFLP is a separate corporation with its own management and because the record indicates that most of the revenues generated by NFLP are shared by the teams on an equal basis. Nevertheless we think it clear that for the same reasons the 32 teams' conduct is covered by § 1, NFLP's actions also are subject to § 1, at least with regards to its marketing of property owned by the separate teams. NFLP's licensing decisions are made by the 32 potential competitors, and each of them actually owns its share of the jointly managed assets. Cf. *Sealy*, 388 U.S., at 352–354, 87 S. Ct. 1847, 18 L. Ed. 2d 1238. Apart from their agreement to cooperate in exploiting those assets, including their decisions as the NFLP, there would be nothing to prevent each of the teams from making its own market decisions relating to purchases of apparel and headwear, to the sale of such items, and to the granting of licenses to use its trademarks.

██ We generally treat agreements within a single firm as independent action on the presumption that the components of the firm will act to

---

**6.** As discussed *infra*, necessity of cooperation is a factor relevant to whether the agreement is subject to the Rule of Reason. See *NCAA*, 468 U.S. 85, 101, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984) (holding that NCAA restrictions on televising college football games are subject to Rule of Reason analysis for the "critical" reason that "horizontal restraints on competition are essential if the product is to be available at all").

**7.** In any event, it simply is not apparent that the alleged conduct was necessary at all. Although two teams are needed to play a football game, not all aspects of elaborate interleague cooperation are necessary to produce a game. Moreover, even if leaguewide agreements are necessary to produce football, it does not follow that concerted activity in marketing intellectual property is necessary to produce football.

The Court of Appeals carved out a zone of antitrust immunity for conduct arguably related to league operations by reasoning that coordinated team trademark sales are necessary to produce "NFL football," a single NFL brand that competes against other forms of entertainment. But defining the product as "NFL football" puts the cart before the horse: Of course the NFL produces NFL football; but that does not mean that cooperation amongst NFL teams is immune from § 1 scrutiny. Members of any cartel could insist that their cooperation is necessary to produce the "cartel product" and compete with other products.

maximize the firm's profits. But in rare cases, that presumption does not hold. Agreements made within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself,[8] and the intrafirm agreements may simply be a formalistic shell for ongoing concerted action.

[560 U.S. 201]

See, *e.g.*, *Topco Associates, Inc.*, 405 U.S., at 609, 92 S. Ct. 1126, 31 L. Ed. 2d 515; *Sealy*, 388 U.S., at 352–354, 87 S. Ct. 1847, 18 L. Ed. 2d 1238.

For that reason, decisions by NFLP regarding the teams' separately owned intellectual property constitute concerted action. Thirty-two teams operating independently through the vehicle of NFLP are not like the components of a single firm that act to maximize the firm's profits. The teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP's financial well-being. See generally Hovenkamp, 1995 Colum. Bus. L. Rev., at 52–61. Unlike typical decisions by corporate shareholders, NFLP licensing decisions effectively require the assent of more than a mere majority of shareholders. And each team's decision reflects not only an interest in NFLP's profits but also an interest in the team's individual profits. See generally Shusido, 39 Hastings L. J., at 69–71. The 32 teams capture individual economic benefits separate and apart from NFLP profits as a result of the decisions they make for NFLP. NFLP's

decisions thus affect each team's profits from licensing its own intellectual property. "Although the business interests of" the teams "will *often* coincide with those of" NFLP "as an entity in itself, that commonality of interest exists in every cartel." *Los Angeles Memorial Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1389 (CA9 1984) (emphasis added). In making the relevant licensing decisions, NFLP is therefore "an instrumentality" of the teams. *Sealy*, 388 U.S., at 352–354, 87 S. Ct. 1847, 18 L. Ed. 2d 1238; see also *Topco Associates, Inc.*, 405 U.S., at 609, 92 S. Ct. 1126, 31 L. Ed. 2d 515.

If the fact that potential competitors shared in profits or losses from a venture meant that the venture was immune from § 1, then any cartel "could evade the antitrust laws simply by creating a 'joint venture' to serve as the exclusive seller of their competing products." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 335 (CA2 2008) (Sotomayor, J., concurring in judgment). "So long as no agreement," other than one made by the cartelists sitting

[560 U.S. 202]

on the board of the joint venture, "explicitly listed the prices to be charged, the companies could act as monopolies through the 'joint venture.'" *Ibid.* (Indeed, a joint venture with a single management structure is generally a better way to operate a cartel because it decreases the risks of a party to an illegal agreement defecting from that agreement.) However, ▮▮▮ competitors "cannot simply get around" antitrust liability by acting "through a

---

**8.** See Areeda & Hovenkamp ¶1471; Elhauge & Geradin 786–787, and n. 6; see also *Capital Imaging Assoc. v. Mohawk Valley Medical Assoc., Inc.*, 996 F.2d 537, 544 (CA2 1993); *Bolt v. Halifax Hospital Medical Center*, 891 F.2d 810, 819 (CA11 1990); *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 706 (CA4 1991); *Motive Parts Warehouse v. Facet Enterprises*, 774 F.2d 380, 387–388 (CA10 1985); *Victorian House, Inc. v. Fisher Camuto Corp.*, 769 F.2d 466, 469 (CA8 1985); *Weiss v. York Hospital*, 745 F.2d 786, 828 (CA3 1984).

third-party intermediary or 'joint venture'." *Id.*, at 336.[9]

## VI

Football teams that need to cooperate are not trapped by antitrust law. "[T]he special characteristics of this industry may provide a justification" for many kinds of agreements. *Brown*, 518 U.S., at 252, 116 S. Ct. 2116, 135 L. Ed. 2d 521 (Stevens, J., dissenting). The fact that NFL teams share an interest in making the entire league successful and profitable, and that they must cooperate in the production and scheduling of games, provides a perfectly sensible justification for making a host of collective decisions. But the conduct at issue in this case is still concerted

**[560 U.S. 203]**

activity under the Sherman Act that is subject to § 1 analysis.

■ When "restraints on competition are essential if the product is to be available at all," *per se* rules of illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule of Reason.[10] *NCAA*, 468 U.S., at 101, 104 S. Ct. 2948, 82 L. Ed. 2d 70; see *id.*, at 117, 104 S. Ct. 2948, 82 L. Ed. 2d 70 ("Our decision not to apply a *per se* rule to this case rests in large part on our recognition that a certain degree of cooperation is necessary if the type of competition that petitioner and its member institutions seek to market is to be preserved"); see also *Dagher*, 547 U.S., at 6, 126 S. Ct. 1276, 164 L. Ed. 2d 1. In such instances, the agreement is likely to survive the Rule of Reason. See *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U.S. 1, 23, 99 S. Ct. 1551, 60 L. Ed. 2d 1 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful. . . where the agreement . . . is necessary to market the product at all"). And depending upon the concerted activity

---

**9.** For the purposes of resolving this case, there is no need to pass upon the Government's position that entities are incapable of conspiring under § 1 if they "have effectively merged the relevant aspect of their operations, thereby eliminating actual and potential competition . . . in that operational sphere" and "the challenged restraint [does] not significantly affect actual or potential competition . . . outside their merged operations." Brief for United States as *Amicus Curiae* 17. The Government urges that the choices "to offer only a blanket license" and "to have only a single headwear licensee" might not constitute concerted action under its test. *Id.*, at 32. However, because the teams still own their own trademarks and are free to market those trademarks as they see fit, even those two choices were agreements amongst potential competitors and would constitute concerted action under the Government's own standard. At any point, the teams could decide to license their own trademarks. It is significant, moreover, that the teams here control NFLP. The two choices that the Government might treat as independent action, although nominally made by NFLP, are for all functional purposes choices made by the 32 entities with potentially competing interests.

**10.** Justice Brandeis provided the classic formulation of the Rule of Reason in *Board of Trade of Chicago* v. *United States*, 246 U.S. 231, 238, 38 S. Ct. 242, 62 L. Ed. 683 (1918):

■ "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint is imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

See also *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 885–887, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007); *National Soc. of Professional Engineers,* 435 U.S., at 688–691, 98 S. Ct. 1355, 55 L. Ed. 2d 637.

in question, the Rule of Reason may not require a detailed analysis; it "can sometimes be applied in the twinkling of an eye." *NCAA*, 468 U.S., at 110, n. 39, 104 S. Ct. 2948, 82 L. Ed. 2d 70.

[560 U.S. 204]

Other features of the NFL may also save agreements amongst the teams. We have recognized, for example, "that the interest in maintaining a competitive balance" among "athletic teams is legitimate and important," *id.,* at 117, 104 S. Ct. 2948, 82 L. Ed. 2d 70. While that same interest applies to the teams in the NFL, it does not justify treating them as a single entity for § 1 purposes when it comes to the marketing of the teams' individually owned intellectual property. It is, however, unquestionably an interest that may well justify a variety of collective decisions made by the teams. What role it properly plays in applying the Rule of Reason to the allegations in this case is a matter to be considered on remand.

\* \* \*

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.